Irving Widett, trustee in bankruptcy, *vs.* Pilgrim Trust Company.

Suffolk.    November 4, 1957. — February 12, 1958.

Present: Wilkins, C.J., Ronan, Spalding, Counihan, & Whittemore, JJ.

*Corporation*, Mortgage, Ultra vires.  *Mortgage*, Of personal property: validity, consideration.  *Fraudulent Conveyance.  Payment.*

A chattel mortgage of all the personal property of a restaurant corporation except stock in trade, given by it by the authority of its directors and with the assent of all its three stockholders pursuant to an agreement made between the three as purchasers of all its shares and the seller thereof whereby, although the mortgage was given to secure a note of the three purchasers to the seller for a portion of the purchase price of the shares, the seller furnished substantial direct benefit to the corporation by discharging all its debts and otherwise, was valid as a corporate obligation and, in the circumstances, was not a fraudulent conveyance, and a trustee in bankruptcy of the corporation subsequently appointed could not successfully attack payments made by it under the mortgage irrespective of its financial condition at the times of the payments.

Contract.  Writ in the Superior Court dated June 9, 1952.

The action was heard by *Kirk*, J., without jury.

*Joseph Kruger*, (*Sydney Berkman & Reuben Goodman* with him), for the plaintiff.

*Francis T. Leahy*, for the defendant.

WHITTEMORE, J. The plaintiff was appointed trustee in bankruptcy of Tremont Lobster House, Inc., hereinafter called Tremont, on December 26, 1950. In this action, in several counts, he seeks as trustee to recover from the defendant bank, hereinafter called Pilgrim, the sum of $25,660.25, and interest. The sum stated is the total of eighteen checks paid to Pilgrim by Tremont from April 30, 1947, to November 29, 1948, inclusive, which were credited on a note of Tremont's stockholders dated March 17, 1947. The note was secured by a chattel mortgage on personal property of Tremont. The note and mortgage were held by Pilgrim by assignment. The note was given by three men, hereinafter called the buyers, to one George, in the amount of $55,000 as part of the purchase price of all the capital stock of Tremont.

After a trial in the Superior Court without a jury, the judge made findings of fact and rulings of law and found for Pilgrim on all counts. These are the plaintiff's exceptions thereto and to the judge's refusal of requested rulings which were to the effect that the mortgage was merely for the accommodation of the buyers, and ultra vires even if all directors and stockholders assented; that the payments on account thereof were in breach of a fiduciary duty of the officers who made them, and a misappropriation of corporate funds; that if the corporation was insolvent or about to become so at the time it made the payments, the plaintiff may recover; and that the corporation became insolvent when it was unable to pay its debts in the usual course of trade. The judge's concluding ruling was that "something in the nature of an equitable estoppel" bars the trustee's claim.

Relevant facts appropriately found or shown, and not in dispute, in addition to those stated in the first paragraph above, include the facts stated in the following paragraphs.

Tremont, in March, 1947, then named Hofbrau, The Original, Inc., owned and operated a restaurant in leased premises at 247 Tremont Street, Boston. George then owned all the capital stock of Tremont and of Atlantic Lobster House, Inc., hereinafter called Atlantic, which operated a restaurant in Charlestown. George had operated both busi-

nesses as though owned personally and also had a wholesale lobster business.

The buyers and George on March 15, 1947, made an agreement, in two documents, relating to the sale of the capital stock of Tremont. In the first document, in substance, George agreed to sell the stock for $80,000 plus the value of a part of the inventory and stock in trade in the restaurant taken at cost, to pay adjusted utility charges and taxes, to furnish evidence that the lease was not in default, and to pay all outstanding obligations of Tremont. In either the first or the second document the seller also agreed not to compete directly or indirectly within a one mile radius for a period of five years.[1] The $80,000 was to be paid as follows: $5,000 down, $20,000 on consummation date and $55,000 by note of the buyers secured by a pledge of the stock, and by a mortgage upon all the personal property of Tremont except stock in trade. This document provided also that the parties "are to enter into a separate contract relative to the use of the name 'The Lobster House' . . . and other matters pertaining thereto."

The second document in substance recited that George, having sold the stock of "Hofbrau, The Original, Inc.," and having agreed to permit the buyers to use the name "The Lobster House" in the operation of the restaurant at 247 Tremont Street, in substance did thereby grant to the buyers the privilege of so using the name, and agreed to sell lobsters to the buyers for the restaurant at the price of such sales by George to the Atlantic Lobster House restaurant, with equal priority therewith in obtaining lobsters, to supply water for the lobster tank, and to mention "The Lobster House at 247 Tremont Street" in all advertising of The Lobster House in Charlestown. "In consideration of the grant herein contained" the buyers agreed to pay George one per cent of the

---

[1] The judge's findings include this provision as in the first document. The exhibits show it set out on a page 4, above the signatures of the parties, bound with what appears as the last page of the first document, page 3, which also is duly signed. The second document has no signature page, and the page numbered 4 may have been that page improperly assembled with the first document.

gross receipts of the restaurant "to be conducted by the Buyers or by the Corporation or by anyone else acting for the Buyers" up to $20,000 a month and two per cent of the gross receipts per month above that sum. The first payment covering the three years from March 17, 1947, was to be made three years from date. The buyers also agreed to purchase all their lobsters from George.

The $5,000 was paid when the documents were signed. The transaction was consummated on March 17, 1947, and the $20,000 then due was paid. The buyers thereafter executed and delivered the note and delivered the mortgage which was signed by one of the buyers as president of Tremont (Hofbrau, The Original, Inc.). The certificate attached was by one of the buyers as clerk and certified a vote of the directors authorizing the president to execute and deliver to George a chattel mortgage in the sum of $55,000 covering personal property "and to decide upon the terms and conditions thereof, said mortgage to secure a promissory note given in consideration of a grant by said . . . George to the Corporation of the right to use the name 'The Lobster House' in the conduct of the business of the Corporation."

The mortgage was duly recorded. George indorsed the note in blank and delivered it to Atlantic. Thereafter Atlantic indorsed it in blank and delivered it to Pilgrim. Atlantic borrowed $41,000 from Pilgrim on the security of a pledge of the $55,000 note and of the mortgage. The eighteen payments made with corporate funds were credited by Pilgrim to the note of the buyers and to the $41,000 loan.

In November, 1948, the buyers borrowed on their personal credit $20,000 and used it, or the greater part of it,[1] to discharge their obligation on the note.

In the view we take of the case it is not necessary to notice the financial state of Tremont at the times when the payments were made.

Relevant provisions of the bankruptcy act are in § 110

---

[1] George, according to the bill of exceptions, testified in substance that he did not receive $80,000 "because he gave them a substantial decrease in the balance."

(a) and (c).[1]  ·The pertinent provisions of the uniform fraudulent conveyance act, G. L. (Ter. Ed.)·c. 109A, are referred to in the opinion, *post.*

We think, for reasons to be stated, that the payments under the mortgage may not be attacked under these pro visions because the mortgage was a valid corporate obligation and was not a fraudulent conveyance under the statute. Compare *Buckman* v. *Elm Hill Realty Co. of Peabody,* 312 Mass. 10.

1. The assent of all the stockholders to the· giving of the mortgage bars any claim, in the right of the corporation, to defeat it; such as a claim based on noncompliance with the provisions of G. L. (Ter. Ed.) c. 156, § 42, as amended by St. 1943; c. 38, § 1, with respect to the voting required for mortgaging all assets, if applicable, or on the contention that the mortgage was merely for the accommodation of stockholders, or was otherwise a distribution of capital.· *Dome Realty Co.* v. *Gould,*·285 Mass. 294.   *Medlinsky* v. *Premium Cut Beef Co.* 317 Mass. 25, 32, and. cases cited. *George H. Gilbert Manuf. Co.* v. *Goldfine,* 317 Mass. 681, 686–687.  ·*Uccello* ·v. *Gold'n Foods; Inc.* 325 Mass.· 319.

2. The defendant contends that, as to it, the validity of the mortgage ·is conclusively established by the clerk's certificate of the directors'· vote.·  No. basis· is shown for denying to Pilgrim the ·right to rely on the clerk's certificate for what it purports to show.  See *Commonwealth* v. *Reading Savings Bank,* 137 Mass. 431.  The right in Tremont to use a trade name in the restaurant business, ·recited in ·the vote as· the consideration of the mortgage, manifestly served a corporate purpose.    There was no suggestion of ·an ·act entirely without the corporate purposes, as in the guaranty

---

[1] U. S.·C. (1946 ed.) Title 11 (and for § 110 [c] Sup. V.) as follows:· "(a) The trustee . . . shall . . . be vested . . . with the title of the bankrupt·as of the date of the filing of the petition ... . to all . . . (4) property transferred by him in fraud of his creditors;  ... . (6) rights of action arising upon . . . the unlawful taking . . . of . . . his property . . . .  (c) The trustee, as to all property of the bankrupt . . . shall be deemed vested as of the date of bankruptcy with all the rights, remedies, and powers of a creditor then holding a lien thereon by legal ·or equitable proceedings, whether or not such a creditor actually exists."

cases. Compare *Limerick Mills* v. *Royal Textile Co.* 288 Mass. 479. Pilgrim points out that the corporate purposes of Tremont are not shown. There is no occasion to determine whether there is any presumption to aid the plaintiff in this respect. We deal with the case as though it were proved that Tremont. had only the general powers of a business corporation engaged in a restaurant business. Nor do we reach the issue of whether the disparity between the amount of the mortgage and the probable worth of the acquired right, with the fact that the note was the note of the stockholders, put Pilgrim on notice that the mortgage may have been substantively only for the accommodation of the stockholders, so that Pilgrim was bound to inquire, and to have its rights determined by the facts behind the certificate. We turn to an examination of those facts.

3. On the facts shown and found, we rule that the giving of the mortgage was within Tremont's power. It was beneficial to the corporation and in its beneficial aspects served to advance its purposes. A ruling that it was beyond its power, if made, was wrong.[1]

There was a benefit to the corporation additional to that recited in the vote and we need not determine whether, in view of the finding that "In February, 1945, Hofbrau, Inc., had filed a business certificate with the city clerk of Boston that the business of 'The Lobster House' was conducted by it at its premises on Tremont Street," George, in 1947, had any interest of value in the name such as would support his grant of it.

The undertaking to give the mortgage was an essential part of an agreement which provided for the payment of all the debts of the corporation. These, in accordance with the evidence, were found to total between $25,000 and $40,000 and were discharged, as agreed. It is unimportant that the agreements were not made by the corporation. The exist-

---

[1] The rulings given and denied are consistent with the concept that the mortgage was beyond the power of Tremont because given to secure the debt of stockholders, but nevertheless binding on the corporation because its benefits were received and retained in such circumstances that subsequent creditors cannot object. See *Dome Realty Co.* v. *Gould*, 285 Mass. 294, 302.

ing and all the prospective stockholders agreed that Tremont would give the mortgage, as one of the means which secured a substantive benefit to the corporation. It is no less a corporate benefit because of advantage also to its new stockholders in their own right. This is not a case of disregarding the separate corporate identity. Compare *M. McDonough Corp.* v. *Connolly,* 313 Mass. 62, 65–66. The informal, beneficial, commitment was implemented by the vote of the corporation to give the mortgage. The argument of the plaintiff that Pilgrim's right is not advanced by George's satisfaction of liabilities (and by implication by the agreement to satisfy them) is based on a misconstruction of the agreement. It is manifestly not true, as the plaintiff asserts, that "the whole point of the contract was that George should deliver to the buyers a corporation free of debt." He was to deliver a corporation not directly indebted, but with assets pledged, in its interest, and subject to be used in discharge of a debt. Judged from the point of view of the corporation this was not a mortgage to secure the debt of another; it was a mortgage to provide for the payment of its own debts.

The benefit to the corporation expressed in the agreement which bound the corporation to give the mortgage,[1] apart from those advantages to the corporation discussed in the next paragraph, was sufficient to sustain the validity of the mortgage as a corporate act. *Wasserman* v. *National Gypsum Co.* 335 Mass. 240, 242–243, and cases cited.

The undertakings of George in the second of the two documents which constituted, as the judge properly ruled, a single agreement, were also beneficial to Tremont in important aspects of its business. Even though consideration for the grant of these benefits was separately expressed (the "royalty") it is difficult to see how the buyers could have used these privileges otherwise than in the corporation's interest. Having been obtained as a part of the trade in which the

---

[1] It is not necessary to determine whether the agreement not to compete was also a consideration for the mortgage commitment. See note page 743, *supra.*

corporation, by its stockholders (and the later vote of its directors), pledged its assets, and being privileges, for which, if used, a payment of a percentage of the corporation's receipts was to be made, they were in equity corporate assets. It is not important on the issue of the validity of the mortgage as a corporate act whether they were worth more than the consideration separately expressed therefor. They also vouch that the transaction in which the giving of the mortgage was committed was substantively beneficial to Tremont and hence a mortgage for the purposes of the corporation.

The payments on the mortgage were appropriately charged to "Officers' Loan Account." As between the corporation and the officers, the makers of the note, they were the principals and it was proper to reflect on the books the obligation of the officers to the corporation as a result of its payments in discharge of its obligation on the chattel mortgage.

4. The mortgage was not a fraudulent conveyance under G. L. (Ter. Ed.) c. 109A. Apart from the question of "fair consideration" (c. 109A, § 3) this issue is disposed of by our holding, in *Widett* v. *George, post,* 746, that, following the giving of the mortgage, Tremont, about to engage in business, was not left with unreasonably small capital (c. 109A, § 5). There is no suggestion that Tremont was insolvent (c. 109A, § 2) upon giving the mortgage, so that any question could arise under § 4.

5. We do not reach the question, which has been argued, of whether, had the mortgage not been for a corporate purpose, though made with stockholder assent, payments on account of it, made at times when the corporation was insolvent in either the equity or the bankruptcy sense, or short of capital, could be sustained as against subsequent creditors because of the solvency of the corporation and the adequacy of its capital when the mortgage was given. See *Hess* v. *Cedarhome Lumber Co.* 139 Wash. 107; cases cited in annotation of that case in 47 A. L. R. 78; *In re Haas Co.* 131 Fed. 232 (C. C. A. 7); *Medlinsky* v. *Premium Cut Beef Co.* 317 Mass. 25, 32; *Dome Realty Co.* v. *Gould,* 285 Mass. 294, 302. Each payment by the corporation, when made, reclaimed its

property, pro tanto, from under the mortgage lien, and was therefore made in exchange for "fair consideration" (G. L. [Ter. Ed.] c. 109A, § 3), even though there was no certainty that the mortgage debt would ever be fully enforced against the mortgaged property. See, as to equivalence of the value of consideration given and received, *Bianco* v. *Lay*, 313 Mass. 444, 450–454. The corporation retained its right to have the buyers, as principals on the mortgage debt, indemnify it for payments made.

6. There was no error in the failure to give the plaintiff's requests or in the finding for the defendant under each count.

*Exceptions overruled.*