**In the Matter of EMERALD HILLS COUNTRY CLUB, INC., Debtor/Bankrupt.**

**EMERALD HILLS COUNTRY CLUB, INC., Debtor/Debtor in Possession, Plaintiff,**

**v.**

**HOLLYWOOD, INC., a Florida Corporation, Defendant.**

**Bankruptcy No. 81–02069–BKC–JAG. Adv. No. 81–0678–BKC–JAG.**

United States Bankruptcy Court, S.D. Florida.

June 17, 1983.

Irving M. Wolff, Miami, Fla., for debtor-in-possession.

William S. Spencer, Hollywood, Fla., Robert E. Venney, Miami, Fla., Raymond B. Ray, Fort Lauderdale, Fla., for Hollywood, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOSEPH A. GASSEN, Bankruptcy Judge.

THIS MATTER was heard before the Court on the Adversary Complaint of Emerald Hills Country Club, Inc, Plaintiff, (Debtor/Debtor in Possession), for Declaratory Judgment as to the validity of a note and mortgage dated September 30, 1980 (Count I) and to set aside a "Fraudulent Conveyance" (Count II) under *Section 548, of 11 U.S.C.* ("First Modification of Mortgage," dated September 8, 1981) and HOLLYWOOD, INC.'S Amended Answer, Affirmative Defenses and Counterclaim to determine the validity and amount of its security.

The Plaintiff filed for protection under Chapter 11, Title 11 U.S.C., Bankruptcy Code, December 15, 1981, and simultaneously filed its Adversary Complaint. The parties on the 9th day of February, 1983, stipulated that the Court shall enter a Final Judgment after making its Findings of Fact and Conclusions of Law (C.P. # 65).

The issues raised by Count I of Plaintiff's Complaint are whether a Purchase Money

Note (P–# 2), Mortgage (P–# 3) and Security Agreement (P–# 4) dated September 30, 1980 executed by Plaintiff, Emerald Hills Country Club, Inc., Charles Schnier and Edwin Cogan, (which obligations represent the deferred purchase price of $500,-000.00 for the stock of Emerald Hills Country Club, Inc. sold by HOLLYWOOD, INC. to Charles Schnier and Edwin Cogan) were (i) valid corporate obligations of Emerald Hills Country Club, Inc., (ii) supported by consideration; and were (iii) consistent with its corporate charter and the laws of the State of Florida.

The issues raised by Court II of Plaintiff's Complaint are whether the "First Modification of Mortgage" to the foregoing mortgage (P–# 6) dated September 8, 1981, was: (i) a valid corporate obligation of Emerald Hills Country Club, Inc.; (ii) supported by consideration; and was (iii) consistent with its corporate charter and the laws of the State of Florida, and (iv) as a consequence, secured by way of "cross-collateralization", a purchase money wrap-around note (D–# J) and mortgage (D–# K) to HOLLYWOOD, INC. pertaining to the two hundred thirty-five (235) "Apartments" also purchased from HOLLYWOOD, INC. (and its subsidiary, Hollywood Land Company, Inc.) by Charles Schnier and Edwin Cogan, Trustees, concurrently with their purchase of the stock of Emerald Hills Country Club, Inc. An additional legal and essential factual element raised in Court II is whether the execution of the "First Modification of Mortgage" rendered Emerald Hills Country Club insolvent as defined by *Section 548 of 11 U.S.C.* which the Plaintiff has the burden of proof of establishing prior to relief under Section 548.

The Court having heard the evidence, and studied the briefs of the parties, and being fully advised in the premises, makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

From the record and the evidence, it is apparent that the following salient facts occurred relevant to the legal issues before the Court:

1. After extensive negotiations between William D. Horvitz, on behalf of HOLLYWOOD, INC., and Charles Schnier, on July 16, 1980, HOLLYWOOD, INC., as Seller, entered into an Agreement for the sale of Emerald Hills Country Club, represented by the outstanding stock (100 shares), to Charles Schnier and Edwin Cogan, Trustees (P–# 1). Simultaneously with the execution of the foregoing agreement, HOLLYWOOD, INC., as Seller, together with its wholly owned subsidiary corporation, Hollywood Land Company, Inc., executed an Agreement with Charles Schnier and Edwin Cogan, Trustees, as "Purchaser" to sell the adjacent two hundred thirty-five (235) Emerald Hills Country Club Apartments ("Apartments") and a certain parcel of vacant land ("Vacant Land") adjacent thereto (D–# P). Thereafter, subsequent to July 16, 1980 but prior to the closing on September 30, 1980, for the convenience and at the request of Charles Schnier, HOLLYWOOD, INC. executed a new Agreement pertaining solely to the Vacant Land ("dated" as of July 16, 1980) (D–# Q), and executed a new Agreement pertaining solely to the Apartments ("dated" as of July 16, 1980) (D–# H). All of the "Agreements" contained mutual conditions precedent on the obligation to perform of the parties thereby making the Agreements mutually dependent upon the simultaneous closing of all Agreements with the further provision that a default in one Agreement would be a default in all of the Agreements. The evidence indicates that the parties had agreed during negotiations, that the value of Emerald Hills Country Club stock was $3,000,-000.00 (C.P. # 57, p. 214, 238) and the Apartments $14,000,000.00 with the total value of the combined transaction, including the Apartments, equivalent to $17,000,-000.00 which together with the vacant land parcel in the amount of $1,500,000.00 equalled a total of $18,500,000.00. The evidence further reflects that HOLLYWOOD, INC. and Charles Schnier as parties to the contracts for the sale of the "Country

Club", "Apartments," and "vacant land" considered the purchase and sale as a single transaction (C.P. # 57, p. 195). However, the evidence also reflects that due to various tax considerations by Charles Schnier he requested a reallocation of a portion of the purchase price for the Country Club under the "Agreements" (C.P. # 57, p. 194, 238–240) (C.P. # 54, p. 27–28, 31–33) and HOLLYWOOD, INC. agreed as reflected therein: i.e., $500,000.00 for the stock of Emerald Hills Country Club, Inc. and $16,-500,000.00 for the Apartments, for a total of the Country Club and Apartments of $17,-000,000.00 which, plus the vacant land, made a grand total of $18,500,000.00.

The "Agreements" contained a number of conditions relative to the closing. Paragraph 9(a) of the Emerald Hills Country Club Agreement (P–# 1) *"Conditions precedent to closing as to Seller"*, required Emerald Hills Country Club, Inc. to execute the purchase money note (P–# 2), mortgage (P–# 3) and security agreement (P–# 4) which the Plaintiff now seeks to invalidate. Secondly, the note, together with the mortgage and security agreement securing the deferred purchase price for the Emerald Hills Country Club stock, was required to contain and did in fact contain a "cross-default" provision with reference to the contemplated "Apartment Note" (D–# J) evidencing the purchase money obligation for the Apartment purchase which was commonly called during the course of the trial, the "Wrap-around Note (D–# J) and Mortgage (D–# K)" (Paragraph 11 of the Mortgage). Likewise, the "wrap-around mortgage" contained a similar cross-default provision as required by the "Apartment Agreement" referencing the obligation of Emerald Hills Country Club, Inc., Schnier and Cogan (Paragraph 23 of the mortgage (D–# K)). The "Country Club Note" (P–# 2) also contained, inter-alia, the foregoing language . . .

> "Notwithstanding anything in their Promissory Note to the contrary, it is understood and agreed by the holder hereof that it shall look to the security for the discharge of this obligation in the event of any default said security being

the Mortgage and Security Agreement being given to it by the makers hereof."

At the time of closing, the "Wrap-around Note (D–# J) and Mortgage" (D–# K) equalled $13,750,000.00 and the Country Club Note and Mortgage was $500,000.00. In addition to the foregoing note and mortgages, the record reflects that HOLLYWOOD, INC. holds a security interest by reason of a security agreement (P–# 4) and a properly filed U.C.C. financing statement (P–# 5) recorded both in Tallahassee and Broward County as additional collateral on the personal property of Emerald Hills Country Club, Inc.

2. At the time of closing, a "Corporate Resolution" of Emerald Hills Country Club, Inc. (D–# E) was duly signed by its President and Secretary, respectively, and delivered to HOLLYWOOD, INC. confirming its obligation on the note and mortgage to HOLLYWOOD, INC. The evidence reflects the "Resolution" was prepared by Bert Tannenbaum as attorney for Emerald Hills Country Club, Inc. and Charles Schnier. The Resolution states:

> "RESOLVED, as follows:
>
> That the corporation execute a mortgage for a loan in the amount of FIVE HUNDRED THOUSAND AND NO/100 DOLLARS, ($500,000.00) to HOLLYWOOD, INC., to be secured by the property described on Exhibit "A" hereto and made a part hereof.
>
> That the officers of the corporation, namely Clifford Waxman as President and Barry Brown as Secretary, be and they are hereby authorized and empowered to execute any and all documents and instruments which may be necessary and are required in order to consummate said mortgage loan, including but not limited to a mortgage, promissory note, guaranty, etc., which may be required by HOLLYWOOD, INC. in order to consummate said mortgage."
>
> "I HEREBY CERTIFY that the foregoing Resolution is in full force and effect and has not been modified or revoked."

Charles Schnier during his testimony did not contradict the Resolution placed in evidence relative to the execution of the $500,000.00 note and mortgage.

At the time of closing the "Apartments" were purchased by Charles Schnier and Edwin Cogan's assignee corporations, "Emerald Hills Associates", ("Apartment Corporations") and the vacant land by the "North Hills Land Corporations".

In early April, 1981, Charles Schnier succeeded to the interests of Edwin Cogan in all of the properties and after April, 1981, Charles Schnier was the sole stockholder, owner and operating officer of Emerald Hills Country Club, Inc., all of the Emerald Hills "Apartment Corporations" (Emerald Hills Associates) as well as all of the "North Hills Land Corporations" which owned the vacant land (C.P. # 57, p. 37).

3. The record and evidence reflect a number of direct as well as indirect benefits flowing to Emerald Hills Country Club, Inc. by reason of the "Agreements" between the parties. A summary may be stated as follows:

A. HOLLYWOOD, INC., pursuant to the July 16, 1980, Emerald Hills Country Club Agreement, specifically Paragraph 3(i), contributed $630,000.00 of capital to Emerald Hills Country Club, Inc. previously represented by stockholder loans (C.P. # 57, p. 85). (C.P. # 53, pp. 26–29)

B. Subsequent to the closing, HOLLYWOOD, INC., pursuant to Paragraph 2(c) of the Agreement was required to balance all current liabilities of Emerald Hills Country Club, Inc. against all its current assets. This sum was determined by the accountants for each party to be a deficit of $215,972.00. Accordingly, after adjustment for credits due HOLLYWOOD, INC., including those pursuant to a letter agreement of September 30, 1980, HOLLYWOOD, INC. paid to Charles Schnier and Edwin Cogan the sum of $100,023.00 (D–# L) and immediately thereafter, upon receipt of said sums from HOLLYWOOD, INC., Charles Schnier and Edwin Cogan paid said sums to Emerald Hills Country Club, Inc., by a "stockholder loan". Charles Schnier testi-

fied that he bought out Edwin Cogan in April of 1981 (C.P. # 57, p. 37) and that by reason of his individual arrangements with Edwin Cogan it was his opinion that Emerald Hills Country Club, Inc. no longer owed Edwin Cogan any sums of money (C.P. # 57, p. 38).

C. In anticipation of the "Agreements" and closing HOLLYWOOD, INC. on or about July 7, 1980 transferred five (5) lots to Emerald Hills Country Club, Inc. and the lots were entered on the books of the Club at $30,949.73 ("cost"); however, the testimony reflected a closer fair market value in excess of $220,000.00 and further, the testimony reflected that the acreage involved in the lots comprised roughly ten (10%) per cent of the tennis club facilities. The Court notes, however, at the time of the negotiations between Charles Schnier and William Horvitz the lots and tennis courts were then being used by Emerald Hills Country Club and Charles Schnier, as buyer of the stock, contemplated they would be a part of the corporate assets at time of closing. (C.P. # 53, p. 9–10)

D. Pursuant to a "September 30, 1980 Letter Agreement", (D–# C) with Charles Schnier, HOLLYWOOD, INC. made it possible for substantial improvements to be completed to the Country Club Property. The record reflects Charles Schnier became involved in management decisions regarding the Club operations prior to the closing, and starting shortly after the time the July 16, 1980 "Agreements" were executed. The improvements required by the September 30, 1980 letter agreement included cart paths, sand traps and other items reflected on the final letter of adjustment, February of 1981. (D–# L)

E. HOLLYWOOD, INC. as part of the overall transaction, and simultaneously with the conveyance of the "Vacant Land" to the Schnier assignee Corporations deeded to the Corporations a parcel known as the "cart path" (D–# R) with the stipulation that the corporations ("North Hills Land Corporations") simultaneously grant an easement for ingress and egress to Emerald Hills Country Club (D–# J).

4. Emerald Hills Associates ("Apartment Corporations") commenced a condominium conversion of the Apartments and the September 30, 1980 "Apartment Wraparound Note and Mortgage" was modified on several occasions subsequent to the closing in order to facilitate financial arrangements and business exigencies of the "Apartment Corporations". A "Modification of Wrap-around Mortgage" dated March 11, 1981, was recorded March 27, 1981 in Broward County Official Records Book 9491, page 616 (D-# M). A "Second Modification of Wrap-around Mortgage" was dated May 1, 1981 and recorded May 19, 1981 in Official Records Book 9589, page 346 (D-# M). There is no dispute that the "Wrap-around Note and Mortgage" is a valid obligation and secured by the assets of the "Apartment Corporations".

5. The record reflects that no principal payments were required on the Emerald Hills Country Club, Inc., Schnier and Cogan $500,000.00 note and mortgage until September 30, 1981, with the full balance being due and payable September 30, 1983. The first installment due on September 30, 1981 was not made, thereby placing the note in default. The record further reflects that subsequent to the closing the principal sum of $13,750,000.00, as evidenced by the "Apartment Wrap-around Note and Mortgage," was reduced by periodic payments and Charles Schnier testified that as of September 9, 1981, the date the "First Modification to Mortgage" was executed by HOLLYWOOD, INC. and Emerald Hills Country Club, Inc. (and challenged by Count II), the principal and interest indebtedness outstanding was approximately $11,229,000.00 (C.P. # 57, p. 63). Jim Lewis testified that as of December 15, 1981 the principal indebtedness was $11,246,200.00.

6. The testimony and evidence reflects that the Emerald Hills Country Club "First Modification of Mortgage" (P-# 6) which Plaintiff now seeks to set aside in Count II evolved from a series of negotiations and meetings between William D. Horvitz, President and Chief Executive and Operating officer of HOLLYWOOD, INC. and Charles Schnier as the sole stockholder and operating officer of Emerald Hills Country Club, Inc. and the "Apartment Corporations". The testimony of William D. Horvitz, and corroborated by Stanley Beckerman, established that Charles Schnier and William D. Horvitz met in July of 1981 and reached a tentative, oral agreement, whereby HOLLYWOOD, INC. would undertake to provide the necessary financing for one hundred (100) individual condominium units by taking back purchase money mortgages from buyers of Condominium Apartment Units from Emerald Hills Associates under terms and conditions as ultimately stated in a written agreement referred to at trial as the "8% Agreement" (Exhibit D-D, "dated", July 9, 1981). William Horvitz testified the financing arrangement between HOLLYWOOD, INC. and Charles Schnier on behalf of the "Apartment Corporations" (Emerald Hills Associates) was in consideration, in part, of the Agreement by Charles Schnier on behalf of Emerald Hills Country Club, Inc. to the "First Modification of Mortgage" (C.P. # 57, p. 199).

The testimony of William D. Horvitz and Charles Schnier conflicted as to when the "8% Agreement" was executed and as to whether or not the "First Modification of Mortgage" was independent of or conditioned upon the "8% Agreement"; however, the Court is persuaded by the evidence and credibility of the testimony of William Horvitz and Stanley Beckerman regarding the circumstances and execution of the "8% Agreement" and "First Modification of Mortgage". The testimony of Stanley Beckerman (C.P. # 57, p. 94) and the correspondence with Charles Schnier's and Emerald Hills Country Club, Inc.'s attorneys in evidence (September 3, 1981, letter from Stanley Beckerman (D-# G)) established that the "8% Agreement" was not finalized until early September 1981 and secondly, was returned to HOLLYWOOD, INC. on or about September 8, 1981, for execution by HOLLYWOOD, INC. at the same time as the "First Modification of Mortgage" (C.P. # 57, p. 96–97). William D. Horvitz testified that the "First Modification of Mortgage" was to clarify and confirm an agree-

**414**

ment reached between himself and Charles Schnier to the effect that the Country Club assets were to "cross-collateralize" the "Apartment" obligations, due to the fact that the parties had treated the sale of the Country Club and the Apartments as a single transaction (C.P. # 57, p. 194–195). The recitations in the "First Modification of Mortgage" of September 8, 1981 bear this out and refer back to the original Emerald Hills Country Club, September 30, 1980 mortgage.

The testimony of William D. Horvitz and Charles Schnier established that the "Apartment Corporations" (and Charles Schnier), contemplated a successful marketing campaign by reason of the "8% Agreement" and that it was important to the continued marketing of the "Apartment" Condominium conversions by Emerald Hills Associates. Charles Schnier confirmed that without such a successful marketing campaign he would have had considerable difficulty in paying, in a timely fashion, the "Apartment Wrap-around Note and Mortgage".

The potentially detrimental effect on Emerald Hills Country Club, of the inability of the "Apartment Corporations" to pay their debt to HOLLYWOOD, INC. is clear by reason of the original "cross-default" provisions contained in both the September 30, 1980, "Country Club" note and mortgage, as well as the "Apartment Wraparound Note and Mortgage". As a consequence of the "cross-default" provisions, the Country Club had a direct and pecuniary interest and stood to benefit from the successful financing and marketing of the "Apartments", which was facilitated by the "8% Agreement". The inter-relationship between the Country Club and "Apartment Corporations" and the benefits derived from the "8% Agreement" is further evidenced in advertisements promoting the "8% Financing" (D-Comp. Ex. # N). The advertisements include Wall Street Journal publications as well as ads contained in the Miami Herald and Hollywood Sun-Tattler. The advertisement offered "free club memberships" for one (1) year in Emerald Hills Country Club in order to promote the Apartments as well as "8% Financing" during a period when interest rates were almost twice as high.

The authority of Charles Schnier and Esther Schnier, his wife, as President and Secretary, respectively, of Emerald Hills Country Club, Inc. to execute the "First Modification of Mortgage" was not challenged by Charles Schnier. To the contrary the testimony of both Charles Schnier and Bert Tannenbaum, as attorney for both Charles Schnier and Emerald Hills Country Club, Inc., established that Charles Schnier and Mr. Tannenbaum had met prior to its execution and Charles Schnier and Esther Schnier thereafter executed the "First Modification of Mortgage" in their corporate capacities as President and Secretary. The Court also notes from the testimony of Charles Schnier that he executed the "First Modification of Mortgage," notwithstanding the advice of his attorney to the contrary. (C.P. # 57, p. 42).

■ 7. As to Count II, Plaintiff bears the burden to establish its right to relief under *Section 548, 11 U.S.C.* and consequently had to demonstrate, inter alia, that at the time of the "First Modification of Mortgage" (September 8, 1981) that an "insolvency" was created as to Emerald Hills Country Club, Inc. *and* that it did not receive reasonably equivalent value for the transfer. The Court considered the following testimony and evidence relevant to Plaintiff's burden under *Section 548, 11 U.S.C.:*

The Plaintiff introduced into evidence an appraisal of the Emerald Hills Golf Course and Country Club properties as prepared by Charles V. Failla and Associates, Inc. (P-# 13). As of January 6, 1982 the appraisal indicated a fair market value of $4,200,000.00 for the property consisting of an 18 hole, par 72 golf course and clubhouse facilities including twelve (12) composition tennis courts, a tennis clubhouse and swimming pool and Country Club. Charles V. Failla testified that there would have been relatively little change between September, 1981 and the appraisal date of January 6,

1982, and indicated perhaps a falling in value between those two dates. The balance sheet and operating statement of Emerald Hills Country Club, Inc. as of September, 1981, is in evidence as part of a composite Exhibit (P–# Comp. 11).

Utilizing Charles V. Failla's appraised value of the assets (as opposed to the historical cost, less depreciation value, as reflected by the balance sheets) as of September 8, 1981 (the date of the "First Modification of Mortgage") the relative net worth of Emerald Hills Country Club was in excess of $1,649,000.00 compared to a deficit "Book" Net Worth of $1,552,018.00. Charles Schnier's testimony indicated the contingent liability of the Country Club for membership dues was offset by new members and the membership continued to grow during the period 1980–1982 (C.P. # 57, p. 71) and further, the dues for new members increased although the Country Club was only required to refund seventy-five per cent (75%) of the dues to members that terminated memberships (C.P. # 57, p. 72). The Court also notes that in the schedule of assets and values thereof, as filed by Charles Schnier on behalf of the debtor, Emerald Hills Country Club, Inc. (D–# O), the stated value of the assets of Emerald Hills Country Club was $6,000,000.00 and comparing that value to September, 1981, the stockholder equity of Emerald Hills Country Club, Inc. would have been approximately equivalent to $3,549,000.00. The Court is also cognizant that this would place the "value" of the Country Club close to the $3,000,000.00 William D. Horvitz testified the parties had agreed to during negotiations as representing the equity and value of Emerald Hills Country Club, Inc. (C.P. # 57, p. 214). Charles Failla testified under cross-examination, when asked what value Charles Schnier had stated he had placed on the Emerald Hills Country Club, Inc. stock (assets) at time of the purchase, Charles Schnier said the Country Club and Apartments were one transaction and the price of Emerald Hills Country Club was included in the overall purchase price.

The Plaintiff, during its case in chief, did not present evidence as to the value of the "Apartment Corporations" assets. However, HOLLYWOOD, INC. introduced an appraisal of the Emerald Hills Country Club Condominium Apartments prepared by Charles V. Failla & Associates, Inc. (D–# B) (at the request of Charles Schnier) which reflects the fair market value of the "Apartments" as of January 6, 1982, less the individual apartments which had previously been sold. Charles V. Failla & Associates' appraisal of the 193 units remaining unsold as of January 6, 1982 (42 units had either been sold as of January 6, 1982 or showed under contract) reflected an "undiscounted value" as of the appraisal date of almost $19,000,000.00. Charles V. Failla testified, as he did with reference to the Country Club, that there would have been an insignificant change in value between September of 1981 and January of 1982. The appraisal reflects that as of January 6, 1982, 35 units had been previously sold and 7 units were then under contract. Jim Lewis testified that 2 of the units included in the 42 sold units or units under contract were unsold as of September 8, 1981 according to his records (Unit 4060/ # 29 and Unit 4060/ # 26), and therefore, as of September 8, 1981 a total of 202 units were available for sale (C.P. # 57, p. 148). The sales prices of the two units as reflected by the appraisal totaled $186,168.00. The total "undiscounted" value of the 202 units, based on the appraisal, after adjustment for the two units, as of September 8, 1981, would have been equal to $19,155,310.00 and the "discounted" appraisal value (which is after adjustments to the present value to take into account marketing absorption over a future two year period) was equal to $15,656,499.00.

Charles Schnier testified that in September of 1981 the approximate outstanding indebtedness to HOLLYWOOD, INC., taking into account the Greenwich first mortgage ($2,029,000.00) (C.P. # 57, p. 63), and the balance of the "Wrap-around Note and Mortgage" held by HOLLYWOOD, INC., ($9,200,000.00), (C.P. # 57, p. 63) amounted to a total of $11,229,000.00. Based on the appraisal "Discounted Value" of $15,656,-

499.00 for the 202 apartments and after payment in full of the outstanding principal obligations due HOLLYWOOD, INC. as of September, 1981, there would have been a remaining value in the Apartment assets in excess of $4,427,499.00.

8. The operating profits of Emerald Hills Country Club, Inc. historically, as far back as 1975, had shown an increase in operating revenues and profits before depreciation. Jim Lewis, as Finance Director of HOLLYWOOD, INC., testified that the club had shown an increase in operating profits as follows (C.P. # 57, p. 141–143):

| Income before Depreciation: | | Depreciation: |
|---|---|---|
| 75 | $ 42,481.20 | $188,537.62 |
| 76 | $ 21,748.64 | $197,168.05 |
| 77 | $ 77,885.91 | $205,043.34 |
| 78 | $ 96,053.74 | $195,112.06 |
| 79 | $238,950.53 | $183,222.63 |

Jim Lewis testified that in 1980, the year of the sale, there had not been an operating profit due to the fact that during a substantial portion of the year the club and the golf course were undergoing renovations. Jim Lewis also testified that the stockholder loans due HOLLYWOOD, INC. in the amount of $630,000.00, which were converted to capital pursuant to the Purchase Agreement, were considered collectible and capable of repayment from operating revenues (C.P. # 57, p. 145).

With respect to the picture of operating revenues of Emerald Hills Country Club, Inc. subsequent to the September 30, 1980 "closing", Lois Kline, as Bookkeeper for Emerald Hills Country Club, Inc. testified that she made the following repayments to Charles Schnier on his loans in 1981 (C.P. # 57, p. 81), and that she had adequate capital to meet all anticipated cash needs of Emerald Hills Country Club as of December, 1981 (C.P. # 57, p. 84). Further, Lois Kline testified all trade accounts were current and were being paid on a monthly basis right up to December of 1981 (C.P. # 57, p. 80). The repayments to Charles Schnier in the last quarter of 1981 (as reflected by Defendants' Composite Exhibit # F) were as follows:

| August, 1981 | $ 8,000.00 |
|---|---|
| October 5, 1981 | $10,000.00 |
| October 15, 1981 | $10,000.00 |
| October 22, 1981 | $10,000.00 |
| December 8, 1981 | $25,000.00 |
| | $63,000.00 |

Charles Schnier testified the creditors of Emerald Hills Country Club, Inc., subsequent to September 8, 1981, were creditors for services, materials and goods rendered to the "Club" after September 8, 1981, and the accounts payable were current as of September 1981 (C.P. # 57, p. 50).

9. On December 15, 1981 and simultaneously with the Bankruptcy Petition filed by the Plaintiff, Emerald Hills Country Club, Inc., the "Apartment Corporations" ("Emerald Hills Associates") and the "North Hills Land Corporations" also filed petitions for protection under *Chapter 11, Title 11 U.S.C.*

## CONCLUSIONS OF LAW

10. Emerald Hills Country Club, Inc., pursuant to Florida Law, as well as its Corporate Charter, had authority to execute the September 30, 1980, $500,000.00 note and mortgage to HOLLYWOOD, INC. and the Court finds that the note and mortgage are supported by legal consideration. As a consequence the Court concludes the Plaintiff is not entitled to the relief sought in Count I and that HOLLYWOOD, INC. is legally entitled to the affirmative relief requested in its Counter-Claim declaring that the principal amount of $500,000.00, as evidenced by the note plus the accrued interest, is secured by the mortgage and security agreement on the Country Club properties.

The facts reflect that the note and mortgage were given with the unanimous consent of all the shareholders, officers, and directors of Emerald Hills Country Club, Inc. Consistent with its Corporate Charter, a "Corporate Resolution" of Emerald Hills Country Club, Inc. was delivered to HOLLYWOOD, INC. at time of closing evidencing the authority of the corporate officers to execute and deliver the note and mortgage.

The corporate charter of Emerald Hills Country Club, Inc. provides in part that the

corporation may: "borrow money and contract debts . . . or for any other lawful purposes"; "to enter into, make and perform contracts of every kind for any lawful purposes without limit as to amount. . ."; "to do any or all of the things herein set forth to the same extent as natural persons might or could do in any part of the world. . ." The corporate charter of Emerald Hills Country Club, Inc. also states that the ". . . foregoing enumerations of specific powers shall not be held to limit or restrict in any manner the general powers of the corporation." Further, the charter authorized the corporation to exercise "all of the powers conferred by the laws of the State of Florida upon corporations organized under the Statutes and it is further hereby specifically provided that the foregoing enumerations of specific powers shall not be held to limit or restrict in any manner the general powers of this corporation." Reading the corporate charter in pari-materia with the Florida "Corporation Act," *Florida Statute Ch. 607* et seq., it is evident that Emerald Hills Country Club, Inc. was authorized to take all legal actions to effectuate the proper execution and delivery of the mortgage.

Florida's "New" Corporation Law enacted in 1975 provides that a corporation has the power to make contracts and guarantees, borrow money and grant security interests:

*"607.011 General Powers—"*

(2) Unless otherwise provided by its articles of incorporation, each corporation shall have power:

. . . (c) To sell, convey, mortgage, pledge, create, a security interest in, lease, exchange, transfer and otherwise dispose of all or any part of its property and assets.

. . . (f) To make contracts and guarantees and incur liabilities, borrow money at such rates of interest as the corporation may determine, issue its notes, bonds and other obligations, and secure any of its property, franchises and income.

Likewise, *Florida Statute 607.237* authorizes a corporation to mortgage or pledge or create a security interest in all or any portion of its property, unless the Articles of Incorporation provide otherwise.

HOLLYWOOD, INC. by Agreement contracted to extend credit to Charles Schnier and Edwin Cogan, Trustees, to the extent of the $500,000.00 Purchase Money Note as well as to contribute $630,000.00 of additional "capital" to Emerald Hills Country Club, Inc. in lieu of the previous debt due it, of like amount, together with other transfers of value for the benefit of Emerald Hills Country Club, Inc. As a condition precedent at closing, as required by the "Agreements", Emerald Hills Country Club, Inc. executed the note as an accomodation party, without personal liability, and executed and delivered the mortgage as security for the debt which the Plaintiff seeks to hold invalid. Although the Plaintiff asserted at trial that a mortgage is ineffective if the underlying debt, as evidenced by the note, is limited as to personal liability, the Court concludes as a matter of Florida Law that although a note may contain provisions to the effect that the maker shall not be personally liable and further that the mortgage shall be limited to the security afforded by the mortgage that the mortgage is nevertheless valid and enforceable. *MacArthur v. Merwitzer,* 180 So.2d 164 (Fla. 3rd DCA 1965). There is no dispute between the parties that the mortgage and security agreement were properly perfected by recording on October 1, 1980 and in accordance with Florida Law.

The principles set out in *In Re Terminal Moving and Storage Co.,* 631 F.2d 547 (8th Cir.1980) underscore the results in the present case. The Court, in *In Re Terminal Moving and Storage Co.,* supra, was presented with the following facts as summarized. On January 19, 1973, Herbert E. Walker purchased all of the shares of Terminal Moving and Storage Co. (Terminal), the bankrupt Arkansas corporation, from Terminal Distribution Centers, Inc. (Terminal Distribution) for $100,000.00. Walker paid $10,000.00 in cash and financed the remainder by giving a promissory note in the amount of $90,000.00 to Terminal Distribution. On the same day as the purchase, "Terminal", under the authority of

the new president and sole stockholder, Walker, executed a security agreement pledging all of the assets of "Terminal" in favor of "Terminal Distribution" to secure the promissory note. The Security Agreement and Note were assigned ultimately to Putnam Realty, Inc. The Court noted the Security Agreement was at all times properly filed, thereby giving notice to all subsequent creditors. The Trustee for the bankrupt argued on appeal the security interest was invalid because Walker's pledge of "Terminal's" assets to secure the promissory note was an "ultra vires" act and therefore void and secondly, the security interest was not given for value. The Court, after noting the Arkansas Statute relating to ultra vires acts of a corporation, is patterned after the Model Business Corporation Act, and there were no allegations of fraud, opined the Act essentially eliminated "ultra vires" as a defense except as limited therein, and quoted approvingly 7A W. Fletcher, Cyclopedia of the Law of Private Corporations § 3447 (rev. ed. 1978):

"Creditors of the corporation, whose rights are not infringed by the ultra vires contract, cannot attack it. They cannot attack a corporate transaction as ultra vires unless its intent or effect is to fraudulently divert the corporate assets from their debts. It follows that ordinarily a subsequent creditor cannot object. So a trustee in bankruptcy ordinarily has no greater rights, as the representative of creditors, to attack a corporate transaction as ultra vires, than he has as a representative of the corporation."

Further, the Court held "the trustee in bankruptcy lacks standing under the controlling Arkansas law to assert an 'ultra vires' defense against Putman and that in any event the assent of all the stockholders to the Security Agreement bars any claim or the right of the corporation to defeat it. Widett v. Pilgrim Trust Co., 336 Mass. 738, 148 N.E.2d 167 (1958)."

The Court in the instant case does not find fraud and distinguishes the facts of the present case under consideration from the decision of Judge Clyde Atkins in In the Matter of Sam Senter Farms, Inc., Case # 70–232–BK–CA (S.D.Fla.1974), which found the transaction under consideration by the Court was "a sham and a fraud on the existing and future creditors of Sam Senter Farms, Inc." and compared the Sam Senter Farms, Inc. facts "to where one in control of a corporation by, under the pretense of corporate acts, siphoned off its profits for purely personal purposes". HOLLYWOOD, INC., in good faith and full performance of its obligations pursuant to the "July 16, 1980 Agreements", relied on the acts as well as the representations of the officers and directors and sole stockholders of Emerald Hills Country Club, Inc. and gave value to its detriment at closing in September, 1980.

In Re Terminal Moving and Storage Co., Inc., supra, cites In Re: Southern Laundry, Inc., 101 F.Supp. 664 (S.D.Fla.1951). In In Re: Southern Laundry, Inc. the District Court, on appeal, held that the order of the referee in Bankruptcy cancelling a mortgage was erroneous as the Court found that the corporation was solvent at the time of the mortgage of the corporate assets, the act was voluntary, and there was no actual intent to defraud creditors, and held subsequent creditors who were on notice of the record mortgage could not question the voluntary conveyance. The essential facts relevant to the opinion indicate that the owners of all of the capital stock in the corporation, Southern Laundry, Inc., agreed to sell all of the stock to a purchaser for the sum of $150,000.00 ($75,000.00 of which was to be paid in cash and the balance of $75,000.00 was to be paid in annual installments). To secure the deferred payments the purchasers were to have executed to the sellers a first mortgage on all of the assets of the corporation. Similar to the instant case where HOLLYWOOD, INC. recapitalized Emerald Hills Country Club, Inc. and transferred assets, certain personal assets of the sellers of stock of Southern Laundry, as part of the transaction and bargain, were transferred to Southern Laundry, Inc. and actual fraudulent intent was not shown on the part of the parties. As stated in In Re: Southern Laundry, supra: "Although con-

sent of stockholders might not, of itself, confer corporate power, the conveyance is good as between the corporation and the conveyee."

In Re: Southern Laundry, Inc., supra, is referred to in 71 A.L.R.3d 639, "Validity Of Obligation Given By Corporation Incident To Purchase Of Entire Stock By Sole Shareholder:" § 6, page 655, "Effect of Creditors becoming such subsequently to execution of obligation, (a) Obligation Deemed Valid," and also § 7, "Effect Of Corporation's Receipt Of Benefits, (a) Obligation Deemed Valid", page 662. This Court notes with approval the annotation comment on page 644, that in "the older cases" in which an obligation was held invalid as against subsequent creditors, "the essential basis for such holding was that the execution of such obligation was ultra vires and thus void, or at least voidable, as against any creditor" but that "such a strict application of the doctrine of ultra vires does not comport however with more recent judicial thinking in respect to such theory...". This is particularly apparent in Florida's present corporation act, F.S. 607.021, "Defense of Ultra Vires". The limitations imposed on the defense of "ultra vires" by current judicial decisions and Florida Statutes is emphasized by the comments in 8 Fla.Jur.2d, Business Relationships, § 236, "Ultra Vires as defense with respect to corporate contracts", page 331:

"The doctrine of ultra vires as a defense in actions upon corporate contracts has been so modified by judicial decisions and statutes that it is difficult to conceive a situation where such a defense would be sustained, except where the particular act complained of is not only ultra vires but also illegal."

Hartwell v. Hartwell Co., Inc., 167 N.J. Super. 91, 400 A.2d 529 (1979) is cited for holding a security interest from a corporation valid which was given as part of a bargain between the shareholders and prospective purchasers of the corporate stock:

"Where a corporation gave sole shareholders a security interest in its assets in exchange for the release of a debt owed by the corporation to the shareholders and where, even though forgiveness of the debt was part of a bargain between the shareholders and prospective purchasers of corporate stock, the arrangement inured to the benefit of the corporation, and the corporation received a 'fair consideration' in exchange for creation of the security interest in its assets and therefore, the transaction was not fraudulent as to creditors of the corporation under the sub-sections relating to transfers made without fair consideration." N.J.S.A. 14 A, 14–10 (2, 3), page 530.

■ The Court is of the opinion that although a corporation cannot ratify an absolutely void and ultra vires act, it can, nevertheless, become liable or obligated by way of estoppel. See: 8 Fla.Jur.2d, "Business Relationships", § 272, "Effect of the Invalidity of a Mortgage":

"A mortgage executed by a corporation to secure a debt greater than the amount of its authorized indebtedness may be binding on the corporation as well as the creditors. Such a mortgage, when duly acknowledged and recorded, affords constructive notice of its contents and will be given priority over judgments subsequently recovered against the corporation. And with respect to a mortgage otherwise tainted by illegality, the corporation or other parties to the transaction may be precluded from asserting such invalidity by way of estoppel."

11. As to Count II, Plaintiff did not sustain its Burden of Proof to establish it is entitled to relief under § 548, 11 U.S.C. which permits it to avoid a transfer upon proof of three essential elements:

§ 548 Fraudulent Transfers and Obligations

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the filing of the petition, if the debtor—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay or defraud any entity to which

the debtor was or became, on or after the date that such transfer occurred or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; *and* (emphasis supplied)

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

■ The Court is of the opinion the Plaintiff did not demonstrate the "First Modification of Mortgage", as of the execution date on September 8, 1981 rendered Emerald Hills Country Club, Inc. "insolvent" or incapable of paying its debts or engaging in business within the meaning of § 548, 11 U.S.C. The Plaintiff has asserted that the "contingent liability" created by the "First Modification of Mortgage" on September 8, 1981 rendered it insolvent; however, the Court finds the counter-balance "contingent asset value" of Emerald Hills Country Club, Inc. by reason of either its rights of Subrogation or Indemnity and Contribution as against the "Apartment Corporations" as a primary obligor must be weighed against the "Apartment Corporations" assets. The evidence established the "First Modification of Mortgage" is supported by consideration (in addition to the consideration for the original note and mortgage referred to above). Further, the Plaintiff did not establish by a preponderance of the evidence that the consideration was not of a reasonably equivalent value; rather, the Plaintiff maintained the "First Modification of Mortgage" was without consideration to it. However, the Court

finds that the "8% Agreement" was in fact bargained for concurrently and as a part of the consideration for the Modification (conclusions of fact, Paragraph 6) and a disparity between total secured debt and value of collateral alone does not call for a finding of a lack of reasonably equivalent value. *In Re: Matter of Hemphill,* 18 B.R. 38 (Bkrtcy.S.D.Iowa, 1982).

■ The burden of proof in a bankruptcy case involving alleged fraudulent transfers is on the Trustee or Debtor-in-Possession to prove by a preponderance of the evidence each of the elements of the Bankruptcy Act. *Constructora Maza, Inc. v. Banco de Ponce,* 616 F.2d 573 (1st Cir., 1980). In a Chapter 11 Bankruptcy proceeding where the Debtor-in-Possession seeks to invalidate a transfer of assets as a voidable preference the question of "Insolvency" of the Debtor is an issue of fact, *Constructora Maza, Inc. vs. Banco de Ponce,* supra. 11 U.S.C. § 101(26) defines "insolvent" to be ... "that financial condition such that the sum of such entity's debts is greater than all of such entity's property at a fair valuation". As stated in *Constructora,* supra, for the purpose of determining insolvency, "a fair valuation of the Debtor's assets at a specific time is at best an inexact science, and may often be impossible. As a result, insolvency frequently must be determined by proof of other facts or consideration of other factors from which insolvency may or may not be inferred".

The Court in *In the Matter of Vecco Construction Industries, Inc.* 9 B.R. 866 (Bkrtcy.E.D.Virginia, 1981) following the "balance sheet" test discussed in *Constructora,* supra, focused on the fair valuation of the debtor's assets as compared to its liabilities to determine whether or not the Debtor-in-Possession met its burden of proof on the issue of insolvency. The Court defined "Fair Valuation" as "[A] value that can be made promptly effective by the owner of property to pay his debts.. [U]nder the 'balance sheet test' of the Bankruptcy Act, 'insolvency' results when the aggregate of a debtor's property is not sufficient at a fair valuation to pay his debts, which means a

fair market price that can be made available for payment of debts within a reasonable period of time, and 'fair market value' implies a willing seller and a willing buyer". As further noted in *Vecco Construction Industries, Inc.,* supra, the valuation of assets, unless the debtor company is defunct, must be made from the vantage of a going concern and the application of the "balance sheet test" to determine solvency "focuses not on the liquid funds available at the time of a transfer, but rather on the liquidation value of the debtors assets compared to his liabilities." Also, as stated in *Constructora,* supra, because the value of assets that are not susceptible to immediate liquidation may, in certain circumstances be discounted, it is appropriate for the trier of fact to hear qualified opinion testimony on the assets fairly realizable value.

■ The value of the Emerald Hills Country Club, Inc. assets and the value of the "Apartment Corporations" as of the date of the "First Modification of Mortgage" have been established by the appraisers. As previously set out in the Findings of Fact, the appraisal testimony and evidence established a "discounted" value of the "Apartment Corporation's" assets (202 condominium units) as of September 8, 1981 in excess of $4,400,000.00 over and above the obligations due HOLLYWOOD, INC. The value of Emerald Hills Country Club, Inc. based on the appraisal of its assets as of September 8, 1981 was approximately $1,600,000.00. Based on the record, the Court is of the opinion Emerald Hills Country Club, Inc. was not rendered "insolvent" within the provisions of § 548(a)(2)(B)(i) nor does the evidence indicate it was rendered incapable of meeting its obligations within the provisions of either § 548(a)(2)(B)(ii) or (iii).

The Court, in *In Re: Matter of Ollag Const. Equipment Corp.,* 578 F.2d 904 (2d Cir.1978) citing with approval Learned Hand's landmark opinion in *Syracuse Engineering Co. v. Haight,* 97 F.2d 573, 576 (2d Cir.1938) reiterated the legal principle that contingent subrogation and contribution rights must be valued as assets in determining solvency. The Court, after consideration of the guarantor corporation's "subrogation right" against the debtor, parent corporation, reversed the trial court stating "the trial court's determination that the subrogation rights are of minimal worth was clearly erroneous" as the payee of the note had a valid security interest in the debtor, parent corporation's equipment and a remand was necessary for specific findings as to the "value" as of the date of perfection of the security agreement of the guarantor corporation's physical assets and right of subrogation and contribution against its co-guarantors and co-indemnitors.

*Ollag Const. Equipment Corp.,* supra, is cited as authority in *In the Matter of Hemphill,* 18 B.R. 38, 47 (Bkrtcy.S.D.Iowa 1982) together with other cases noted therein. The Court in, *Matter of Hemphill,* supra, stated, inter alia, that insolvency is a factual determination and the burden of proof to establish the elements of a fraudulent transfer under § 548, 11 U.S.C. is on the debtor seeking to avoid the transfer. The court held: "If the guarantee obligation is to be included among the debtors liabilities for purposes of determining his insolvency, then the subrogation and contribution rights against other collateral must also be taken into account". *Matter of Hemphill,* supra, page 47.

■ In conjunction with the concept of subrogation and contribution rights of Emerald Hills Country Club, Inc., the equitable principle of "marshalling" assets must also be considered. Although subrogation is a distinct area of equity from marshalling, subrogation and substitution of the junior creditor to the senior claimant's right against the singly charged funds is a means of administering relief under or in connection with the marshalling doctrine. *53 Am. Jur.2d, "Marshalling Assets-Subrogation",* § 43, page 34. "Marshalling" is an equitable principle in accordance with which assets and securities of a debtor are resorted to or apportioned in such a manner as to secure protection as to the rights of each of two or more creditors and generally the

term means to arrange or rank in order. "Thus, if one of two joint debtors is primarily liable, marshalling may be enforced for the benefit of the creditors of the one who is only secondarily liable; and the creditors of a surety may compel a resort in the first instance to collateral which has been given by the principal rather than to collateral given by such surety." *53 Am.Jur.2d, "Marshalling Assets", § 23, "Liabilities of Co-Debtors or Sureties"*, page 24, and cases cited therein. The underlying principle is the result of independent equities which requires one co-debtor primarily liable to pay in exoneration of another who is secondarily liable and in such instances the Court will enforce those equities for the benefit of creditors of the party secondarily liable. The effect of the equitable principle of "marshalling" requires HOLLYWOOD, INC. to first satisfy the "Apartment Corporation's" debts from the "Apartment Corporation's" assets. The Court is of the opinion that the equitable principle of "marshalling" will be directed by the State Court in foreclosure and as a consequence the 200 apartments and appurtenances now owned by the "Apartment Corporations", and declared as condominiums, will be first directed to be sold and the proceeds thereof applied to the debt due HOLLYWOOD, INC.

Measuring the solvency of Emerald Hills Country Club, Inc. as of September 8, 1981 on the "balance sheet test" and taking into account the value of the "Apartment Corporation's" assets on a "discounted basis" as of said date and the appraisal "value" of Emerald Hills Country Club, Inc. on that date as required by § 548, 11 U.S.C., the Court concludes, based on the evidence and testimony that HOLLYWOOD, INC. is entitled to the relief sought in its counter-claim declaring that the "First Modification of Mortgage" is valid and by its terms cross-collateralizes the "Apartment Corporations" debt to HOLLYWOOD, INC. arising initially from the July 18, 1980 "Agreements" and the "Wrap-around Note and Mortgage" executed at closing, September 30, 1980, as modified. Further, the Court concludes, predicated on the evidence and testimony

introduced at trial the Plaintiff is not entitled to invalidate and set aside the "First Modification of Mortgage", under § 548, 11 U.S.C.

12. Pursuant to B.R. 921(a), a separate Final Judgment will be entered dismissing the Complaint on behalf of the Plaintiff, Emerald Hills Country Club, Inc., as to both Counts I and II and in favor of HOLLYWOOD, INC. declaring: (i) the $500,000.00 note, plus accrued interest, costs and reasonable attorneys fees, is secured by the mortgage of Emerald Hills Country Club, Inc., dated September 30, 1980 and the Security Agreement, and (ii) the "First Modification of Mortgage", dated September 8, 1981 is a valid security encumbering the properties described in said mortgage and by its terms "cross-collateralizes" the debt due from the "Apartment Corporations" in the amount of $11,246,200.00 principal, plus accrued interest, costs and reasonable attorneys fees.

The Court will enter a Judgment in conformity with these Findings of Fact and Conclusions of Law.

## FINAL JUDGMENT

In conformity with the Findings of Fact and Conclusions of Law of even date, it is:

ORDERED, ADJUDGED and DECREED that:

1. The Complaint of the Plaintiff, Emerald Hills Country Club, Inc., Debtor/Debtor-in-Possession, as to both Counts I and II is hereby dismissed with prejudice and Judgment is entered in favor of HOLLYWOOD, INC.

2. Declaratory Judgment is hereby entered in favor of HOLLYWOOD, INC. on its Counterclaim and against the Plaintiff, Counter-Defendant, and the Court hereby Declares and Adjudges that HOLLYWOOD, INC. holds a valid lien and secured claim on the properties of Emerald Hills Country Club, Inc. by reason of the mortgage dated September 30, 1980 and recorded October 1, 1980 in Official Records Book 9156, page 771 of the Public Records of Broward County (P–# 3) and Security

Agreement of even date (P–# 4), said properties being described therein. The lien of said security secures the debt to HOLLYWOOD, INC. in the principal sum of $500,000.00 plus accrued interest since September 1, 1981, in accordance with the tenor if the note (P–# 2), and together with the costs and expenses as advanced by HOLLYWOOD, INC. to protect its security and which advancements are secured by said mortgage.

Further, the Court Declares and Adjudges that HOLLYWOOD, INC. has a valid secured claim by reason of the First Modification of Mortgage (P–# 6), dated September 8, 1981, and recorded September 14, 1981 in Official Records Book 9793, page 45 of the Public Records of Broward County, Florida; and, said First Modification of Mortgage is a valid security and lien on the properties described in the aforementioned Emerald Hills Country Club mortgage and by its terms "cross-collateralizes" the debt owed to HOLLYWOOD, INC. and its wholly owned subsidiary HOLLYWOOD LAND CO., INC. by Emerald Hills [Amphitrite], Inc.; Emerald Hills [Praxis], Inc.; Emerald Hills [Plexis], Inc., Emerald Hills [C.S.], Inc.; and Emerald Hills [Decern], Inc., d/b/a Emerald Hills Associates; and the Court finds and Adjudges the obligation to be in the principal sum of $11,229,000.00 plus accrued interest since August 1, 1981, in accordance with the tenor of the note (D–# J), together with the costs and expenses as advanced by HOLLYWOOD, INC. to protect its security and which advancements are further secured by said mortgage.