AMERICAN FIDELITY COMPANY *vs.* BETTY G. HARNEY
& others.

Suffolk. May 3, 1966. — June 15, 1966.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, KIRK, & REARDON, JJ.

*Fraudulent Conveyance. Value. Equity Pleading and Practice,* Rehearing.

In a suit in equity by a creditor of a daughter of a decedent to set aside as constructively fraudulent under G. L. c. 109A, §§ 3 (b), 4, assignments by her of her interest in the decedent's estate, which was her only asset, as security for advances made by the assignees to her, a sister of hers, and their mother, who joined with her in giving notes to the assignees and also assigned their interests in the estate to the assignees, exceptions must be sustained in the circumstances to findings by a master that there was no evidence of the value of the decedent's estate at relevant times and that the assignments were not fraudulent, and a final decree dismissing the bill as against the assignees must be reversed, but, on a record not affording adequate basis for the comparison of values necessary to a determination of the issue of fair consideration under the statute, the suit must be further heard on such issue, taking into account among other things certain life insurance and other additional security for the advances.

BILL IN EQUITY filed in the Superior Court on December 15, 1959.

Following hearing by a master, an interlocutory decree confirming his report was entered by *Kalus, J.*, and a final decree establishing indebtedness of the defendants Harney to the plaintiff and dismissing the bill as against the defendants Phillips was entered by *Pillsbury, J.* The plaintiff appealed from both decrees.

*Robert J. Sherer* for the plaintiff.

*John F. McCarty, Jr.* (*Julius Thannhauser* with him) for the defendants Lester M. Phillips & another.

WHITTEMORE, J. The issue on the plaintiff's appeal from the final decree in the Superior Court is whether it may reach and apply the interest of the defendant Betty G. Harney in the estate under the will of her father, William G. Gundelfinger, and set aside, as constructively fraudulent conveyances under G. L. c. 109A, her assignments of that interest to the defendants Bernard D. Phillips and Lester M. Phillips (hereinafter the Phillips) on March 7, 1950, December 28, 1951, and September 19, 1952. The facts are stated in a confirmed master's report. The final decree established the indebtedness of Betty and her husband, Frank L. Harney, Jr., to the plaintiff on account of three indemnity agreements for surety bonds of certain contractors, executed respectively on February 23, 1950, April 13, 1950, and May 16, 1950 (executed by Betty alone).

The applicable statutes are G. L. c. 109A, §§ 3 and 4. Section 3 provides: "Fair consideration is given for property or obligation . . . (b) When such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained." Section 4 reads: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

The master found that during all material times Betty's

only asset was her interest in her father's estate. The final decree established the indebtedness to the plaintiff of Betty and Frank, with interest, in the amount of $323,168.93, and of Betty for the further sum, with interest, of $94,403. The greater part of the joint indebtedness ($219,535.43 in principal amount) arose under the February 23, 1950, indemnity agreement. The amounts secured by the conveyances were such that, with the evidence of the value of Betty's interest, the finding was required that the transfer of Betty's interest in the estate left her without assets and insolvent.

The three conveyances under attack were in indentures executed to secure notes given for advances for the living expenses and accumulated debts of Betty, her sister, Adelaide Harney, and her mother, Mrs. Etta Manning.

The note of March 7, 1950, was made by the three women, in the face amount of $110,000. The Phillips, however, advanced to or for the account of the makers only $101,500, having retained $8,500, as a service charge. The note bore interest at six per cent for three years and at nine per cent thereafter. The note was payable in full on the death of Mrs. Manning and $55,000 was payable upon the prior death of Betty and a like sum upon the prior death of Adelaide. An indenture of the same date transferred all interests of the three makers in the Gundelfinger estate.[1] At that time Mrs. Manning released her power of appointment under the will except as she could exercise it in favor of Betty and Adelaide.

The note of March 7, 1950, listed as collateral security,

---

[1] The will was operative as of March 7, 1950, and thereafter to give (a) one third of the residue of the estate for the benefit of the widow for her life with a gift over as the widow might appoint or in default of appointment to the testator's "lawful heirs surviving her"; and (b) the remainder of the residuary estate left after a bequest therefrom for the testator's son, to the widow for her life and "at her decease to be equally divided among my children then living (not including my said son . . .) and the descendants of such of my children as may have died leaving issue." The indenture of March 7, 1950, and the subsequent indenture of December 28, 1951, set out provisions of the will and recited that "the aforesaid 'one-third thereof'" and "remainder of my residuary estate" had been "established as a Trust Estate . . . [with] Commonwealth Trust Company of Pittsburgh . . . [as] the sole surviving Trustee" and that Betty and Adelaide as the "only two other surviving children" of the testator were entitled to share all the estate and remainder which the trustee might hold at the widow's (Mrs. Manning's) death including any part bequeathed to them by her.

in addition to the assignment of interests in the estate, the assignment of insurance policies on the lives of Betty and Adelaide totaling $75,000 and "other policies . . . to be issued." Apart from short term policies, there were additional policies on the life of Betty for $32,000 and on the life of Adelaide for $7,500. Several very short term Lloyds' policies on the lives of Betty or Adelaide or both totaled $65,000. The note was guaranteed by Frank Harney and Adelaide's husband, Charles Harney.

The note of December 28, 1951, also made by the three women, was in the amount of $76,700 and the time or times of payment were related to the death of each. It bore interest at six per cent a year and was guaranteed by Frank and Charles. Another indenture between the makers and the Phillips again transferred all the makers' interest in the Gundelfinger estate. Additional insurance was provided on the lives of Betty and Adelaide in the amount of $60,000.

Of the total amount of the $76,700 loan, the sum of $11,700 "was taken off the top as a charge by the Phillips for the loan." The note provided increases in the principal amount to be paid to the Phillips as follows: If not paid by: September 7, 1952,[2] to $90,506; September 7, 1957, to $106,797; September 7, 1960, to $126,020; September 7, 1963, to $148,703. Each of these increases was characterized in the note as a "fixed charge for the extension of time of payment." The note also provided that upon maturity there should be paid to the holders a further sum of $5,000.

There were no unusual provisions in the transfer of September 19, 1952. The note for $10,000 was executed only by Mrs. Manning, bore fifteen per cent interest, and was payable in or within three years. The indenture, which for a third time transferred interests in the Gundelfinger estate, was executed by Mrs. Manning and Betty. The note was also secured by a second mortgage of real estate in Newton.

---

[2] The appended "Principal and Interest Payment Schedule" shows "1954" as the first year in which $90,506 would be due. This accords with the three year interval referred to in the note.

The master found that the loans by the Phillips were made in good faith; the Phillips did not know of the indemnity agreements; there was no evidence of the value of the Gundelfinger estate on the dates of the conveyances (finding No. 34) and hence he could not apply the actuarial evidence to determine the value of Betty's interest (No. 35); the assignments were not fraudulent (ultimate findings Nos. 7 and 8).

The plaintiff contends that a schedule dated February 28, 1950, attached to the indenture of March 7, 1950 (incorporated by par. 2 of the addendum to the master's report, filed in response to the plaintiff's objections), is evidence of the value on March 7, 1950, and that this gave a basis, with the actuarial evidence, for finding the value of Betty's estate. The plaintiff further contends that the advance by the Phillips was disproportionately small as compared with this value and that, even without a finding by the master in respect thereof, a decree for the plaintiff is required.

1. We agree that there was evidence of the worth of the estate on March 7, 1950, for purposes of G. L. c. 109A, § 3 (b). The indenture of March 7, 1950, in a "whereas" clause, recited: "a copy of the portfolio constituting the corpus of said Trust Estate being hereto annexed and marked Exhibit 'B.' " Exhibit B listed each of the securities of the estate at cost totaling $366,075.18 and at "Market Value 2/28/50," totaling $541,752.88.[3] The indenture of December 28, 1951, had a like recital in a "whereas" clause, and carried an annexed schedule (with detailed listing) showing the market value of the estate on November 7, 1951, as $723,216.81 (cost, $373,297.50).

The market value on March 7, 1950, could, of course, have been different from the value on February 28. The issue, however, was not the precise market value on the date of transfer. The parties to the indenture accepted the schedule as showing the property transferred. The schedule showed a diversified list of seasoned securities in a testa-

---

[3] U. S. Treasury Bonds, $29,364.50; Common Stocks, $210,594; Preferred Stocks, $63,016; Mortgages, $238,776.38; Formal items $2.

mentary trust of which Commonwealth Trust Company of Pittsburgh was the trustee which in less than two years after March 7, 1950, increased by about one third in market value. This showing was enough to satisfy the burden of proof on the plaintiff. See *Bianco* v. *Lay*, 313 Mass. 444, 454 (agreement as to value); *Lembo* v. *Framingham*, 330 Mass. 461, 464 (sale of real estate at a different time in a case under G. L. c. 79). Compare *Halsey* v. *Winant*, 258 N. Y. 512, cert. den. 287 U. S. 620. This case should not turn on the absence of market figures on the precise transfer dates.

We think that the issue of fairness cannot be determined only as of the date of the first transfer. The later transfers substantially increased the interest of the Phillips in the equity of the transferors in the Gundelfinger estate, an equity which, of course, until those transfers, was property of the transferors. The transfer of September 19, 1952, does not detain us. The effect of the transaction of December 28, 1951, however, was to create an interest of the Phillips in the Gundelfinger estate not directly related to any amount advanced, and an interest that would increase greatly with the passage of time, assuming nonpayment of the notes. We think, therefore, that the December 28, 1951, transfer must also be examined. In this connection, for reasons stated above, there was in the statements in the two indentures as to the "corpus" of the transferred estate sufficient evidence of the value of the Gundelfinger estate on December 28, 1951, to permit the very imprecise comparisons required under the statute.

The probable effect in the aspect noted in the preceding paragraph of the transfer of December 28, 1951, is shown by figures agreed to by the parties and set out by the master in paragraph 3 of the addendum to his report.[4]  This

---

[4] "It was agreed that if material (the defendants Phillips contending that it is not material) . . . the defendants Phillips received in an account which they set up with respect to the three loans involved in this case during the period June 22, 1950 through October 20, 1964, the following:

'1.   From Commonwealth Trust Company, $355,495.73.

2.   Market value of stock dividends of Diamond Alkali Company, $69,304.39.

3.   Dividends on insurance held by the Phillips on the lives of Betty and Adelaide Harney, $4,156.99.

agreement of the parties shows, as noted in the margin, an item "To the defendants Phillips, $247,185.30." The allocation of this item as between principal and interest is not shown, but for present purposes it is enough that, according to the Phillips's answer filed December 29, 1965, there is still due them the sum of $272,158.23. This sum apparently includes a judgment for $27,288.78 obtained by a stranger (Trommer) and bought in by the Phillips.

2. The issue of fairness under G. L. c. 109A, §§ 3 (b) and 4 is a mixed issue of fact and law. For reasons stated below we do not attempt to dispose of it by ruling on the facts before us that the transfers were or were not fair for purposes of the statute.

The plaintiff has not given us useful computations as a basis for the required comparison of values. We accept for purposes of this decision the computations in the Phillips's brief. We agree that it is proper to compare the whole consideration for the transfers with the entire value of the property assigned.[5] We omit the actuarial computations

---

4. Advances to the account by defendants Phillips for insurance premiums on the same policies, $4,500, giving a total of $433,457.11.'

It was also agreed that there has been paid out of this account set up by the defendants Phillips the following:

'To the defendants Phillips, $247,185.30.

Premiums on the insurance policies referred to above, $79,618.14.

Payments to Mrs. Manning or as directed by Mrs. Manning, $54,511.11.

Payments on principal of claimants having assignments subordinate to that of defendants Phillips (this includes a payment of principal on the Trommer claim now controlled by defendants Phillips in the amount of $13,861), $14,236.77.

Interest payments on claims described immediately above, $35,914.28.

Miscellaneous payments for legal fees and for overdue insurance premiums, etc., $6,164.

It is further agreed that all payments described above were made with the consent of Betty G. Harney, Adelaide G. Harney and Etta McC. Manning.' "

[5] The basis for this is stated in the Phillips's brief: "The present case is somewhat unusual in that each of the three assignments was a transfer, not by a single transferor, but one by several individuals (three in the case of the first and second assignments, and two in the case of the third, in which Adelaide did not participate), who in each instance conveyed their distinct interests in the trust estate. Two of the transferors, Adelaide and Mrs. Manning, are not indebted to the plaintiff in any way, and the transfers by them of their interests cannot, in any event, be considered fraudulent as to the plaintiff. We are concerned only with the validity of the transfer of Betty's interest. However, in determining the fairness of the consideration given for that interest, we cannot isolate Betty's interest. Each of the loans was made to the borrowers jointly, as a family unit. The proceeds were used as a fund for the common benefit of all three borrowers. No specific portion of any loan is allocable to Betty alone. Each loan and each assignment securing it constitutes an entire transaction."

and state the figures obtained therefrom for the value as of March 7, 1950, as set out in the Phillips's brief.

"Value of corpus                                        $541,752.88

Value of Mrs. Manning's life estate        $214,962.13

Value of Betty's contingent remainder  $153,101.47
Value of that part of Adelaide's con-
tingent remainder which was assigned
to . . . [the Phillips] [there being a
prior assignment]                                     $ 56,520.78

Total value of interests assigned          $424,584.38
Less: Liens [to others]        $91,500.00

Net value of interests assigned            $333,084.38"

The transfers (including, to give the total figure, the third transfer) may not be judged as conveyances of property worth $333,000 (in March, 1950, and more later) to secure repayment of loans of $196,700 with interest. They were transfers to secure (1) the repayment of net advances of $176,500 and (2) the payment of bonuses in connection with the advances totaling $97,203, and interest on the bonuses. Thus the transfers gave an interest in the property substantially beyond that needed to effectuate the repayment of the advances and interest thereon. The security under the indentures, on the March, 1950, value, exceeded the actual advances by about eighty-eight per cent thereof. Furthermore, there was other security, particularly the insurance policies, to be weighed in making the comparison.

The Phillips point out that the remainder interests of each of Betty and Adelaide would be defeated by her death prior to the death of Mrs. Manning, the life tenant, and contend that "In view of these hazards and uncertainties, it was permissible for the lenders to take ample security." But it appears that the insurance policies were intended to

protect against the risk in respect of the time of Mrs. Manning's death, and that they may have been adequate to do this. The indentures provided that the premiums on the policies should be paid from the funds received by the Phillips from the trustee. And, of course, the longer Mrs. Manning lives, the more will be received by the Phillips under the assignment of all her rights in the estate and ''to any income therefrom.''

We do not overlook that the borrowers were advised by counsel in these transactions negotiated by him, that the loans were certainly not prime bank risks, and that present consideration was received for the undertakings to pay in the future greatly more than the amounts advanced. Conceivably some weight may have been given to these circumstances by the master in his conclusion that the conveyances were not fraudulent. But in the absence of any finding of the value of the transferred interests, that finding implies with certainty no more than the failure of the plaintiff, in the master's view, to prove its case.

The Phillips have cited cases holding that transfers for security of property worth much more than the advance do not show a disproportion to support or require a finding of unfairness, and indeed that even under G. L. c. 109A, § 3 (a), where, the transaction being a sale or the satisfaction of a prior debt, the test is ''a fair equivalent,'' a considerable spread may not make the transaction constructively fraudulent. *Bianco* v. *Lay,* 313 Mass. 444, 449–454, and cases cited. *Troll* v. *Chase Natl. Bank,* 257 F. 2d 825, 829 (2d Cir.). See 46 Harv. L. Rev. 404, 409–412. See also *Oshry* v. *Haddad,* 265 Mass. 199, 202 ($6,000 vs. $2,367.61; ''disproportionately small,'' but mortgagee could have been found acting in bad faith). The decided cases can give only general guidance. They do not show that a great spread is necessarily justified if the risks of the loan are small or the lenders have taken a substantial interest in the corpus of the security above the amount actually advanced.

3. The plaintiff's exceptions to subsidiary findings Nos. 34 and 35 of the master's report and to ultimate find-

ings Nos. 7 and 8 are to be sustained. The facts set out in paragraphs 2 and 3 of the addendum to the master's report are to be deemed incorporated therein. The interlocutory decree confirming the report and the final decree are reversed. The case is to be recommitted to the master for the taking of further evidence in his discretion and for findings as to the fairness of the transfers and the amount of the interest of the Phillips in the transferred property notwithstanding unfairness, assuming it existed. See G. L. c. 109A, § 9 (2) ;[6] *Ripley* v. *Severance,* 6 Pick. 474, 477–478; *Thomas* v. *Beals,* 154 Mass. 51, 54; 79 A. L. R. 138 et seq. There should be, inter alia, a determination of the extent of the risk of loss in the loans made. Alternatively, the master's report, modified as aforesaid, may be confirmed, and the additional proceedings may be before a judge in the Superior Court.

*So ordered.*

---

[6] "A purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation may retain the property or obligation as security for repayment."