**In re LAWRENCE PAPERBOARD CORP., Lawrence Packaging Corp., Harriman Paperboard Corp., Debtors.**

**LAWRENCE PAPERBOARD CORP., Lawrence Packaging Corp., and Harriman Paperboard Corp., by their Official Creditors' Committee, Plaintiffs,**

**v.**

**ARLINGTON TRUST COMPANY, Defendants.**

**Bankruptcy Nos. 84–00367–JG to 84–00369–JG.**

**Adv. No. 84–257–JG.**

United States Bankruptcy Court, D.Massachusetts.

Aug. 14, 1987.

See also, Bkrtcy., 52 B.R. 907.

Thomas Billings, Foley, Hoag & Eliot, Boston, Mass., for plaintiffs.

Joseph S.U. Bodoff, Kaye, Fialkow, Richmond & Rothstein, Boston, Mass., for defendants.

MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

The Debtors, Lawrence Paperboard Corp. ("Lawrence"), Lawrence Packaging Corp. ("Packaging"), and Harriman Paperboard Corp. ("Harriman") (collectively the "Debtors") filed bankruptcy petitions under Chapter 11 of the Bankruptcy Code on March 15, 1984. The Court approved joint administration one week later on March 22, 1984. The Official Unsecured Creditors' Committee (the "Committee") commenced this adversary proceeding on July 13, 1984 against the Arlington Trust Company ("Arlington"), seeking a determination of Arlington's secured status and the recovery of alleged fraudulent conveyances, preferential transfers and improper charges. The Committee amended its eight count complaint on August 22, 1984. Arlington now seeks partial summary judgment with respect to Counts One, Two and Five of the Committee's Amended Complaint.

Through Count One, the Committee alleges that the guaranties, security interests and mortgages executed by the Debtors and delivered to Arlington to secure the performance of their various obligations were *ultra vires* and unauthorized. Through Count Two, the Committee alleges that the guaranties, security interests and mortgages which Lawrence, Packaging and Harriman each granted to secure performance of the obligations of the other Debtors to Arlington were void and unenforceable for want or failure of consideration. Finally, through Count Five, the Committee alleges that the various guaranties, security interests and mortgages granted, the obligations incurred and the payments of money or transfers of property pursuant to the guaranties, security interests and mortgages lacked fair consideration and constituted fraudulent transfers pursuant to Mass. Gen.Laws Ann. ch. 109A, § 4 (West 1958 & Supp.1987), which section is made applicable to this proceeding by 11 U.S.C. § 544(b) (West 1987).

## FACTS

The facts presented are gleaned from materials submitted by Arlington in support of its Motion for Summary Judgment and from portions of deposition testimony given by Robert J. DeLuca ("DeLuca") and Joseph D. Caimi ("Caimi") that are attached to the affidavit of Thomas P. Billings. The Billings' affidavit was submitted with the Committee's opposition to Arlington's motion. The materials submitted by Arlington in conjunction with its motion consist of the following:

1) Affidavit of Joseph D. Caimi;

2) Unaudited Financial Statements for the year ending September 30, 1984 prepared by Coopers & Lybrand

3) Affidavit of Philip McGlone, Assistant Treasurer of Arlington;

4) Affidavit of Mary Caimi, Clerk of Lawrence Paperboard Corp.;

5) Affidavit of Robert J. DeLuca, Senior Vice-President of Arlington (with exhibits E-1 through E-16);

6) First Amended Disclosure Statement to First Amended Consolidated Joint Plan of Reorganization;

7) Plaintiff's Answers and Objections to Defendant's First Set of Interrogatories;

8) Articles of Organization (for all three Debtors); and

9) Report of Examiner.

The Court, where appropriate, has supplemented these materials with information available from the dockets for these cases. The facts presented in Arlington's Motion for Summary Judgment essentially are undisputed. However, the inferences to be drawn from the facts, as well as the need for additional facts, have generated considerable controversy.

Lawrence, Packaging and Harriman are Massachusetts corporations that formerly were engaged in the manufacture of paperboard and the production of printed folding boxboard. Lawrence and Packaging were located at 242 Canal Street in Lawrence, Massachusetts. The companies occupied, according to the Examiner appointed pursuant to 11 U.S.C. § 1104 and Joseph D. Caimi, typical, former textile mill structures that were erected around the turn of the century on approximately 7.5 acres of land along the banks of the Merrimack

River. The production processes of Lawrence and Packaging were integrated since the companies occupied connecting buildings and shared office space. Lawrence sold approximately 35 per cent of its output of paperboard to Packaging, and Packaging obtained nearly all of the paperboard it used to manufacture boxes from Lawrence. The paperboard sheets manufactured by Lawrence simply were passed through an open door to the space occupied by Packaging where they were processed into boxboard.

Unlike the Lawrence and Packaging plants, the Harriman plant is not located in Massachusetts. Rather, that company's plant is located on the banks of the Emory River on a 30 acre site in Harriman, Tennessee. Harriman produced paperboard from hardwoods for use as the inner layer of corrugated board. It was acquired by Lawrence from the Meade Corporation in 1975.

None of the Debtors are operating. All the assets of Lawrence and Packaging were sold at various private sales and at a public auction. A sale of Harriman's assets was noticed out to creditors, but this Court declined to approve the sale. Just recently, a second notice of intended private sale of the Harriman assets was filed with the Court.

Caimi owns all the stock of Lawrence. Lawrence, in turn, owns all the stock of Packaging and Harriman. The officers and directors of all three companies are virtually identical. Caimi, as the president and a director of each of the Debtors, controlled the three companies. Caimi, like his sister Mary Caimi, who served as the clerk of Lawrence and was responsible for the books and records of Lawrence and its two wholly-owned subsidiaries, considered the three companies as a single unit.

According to the Debtors' First Amended Disclosure Statement, the Debtors historically and consistently lost money on a consolidated basis and continued to operate at a loss on a consolidated basis during the Chapter 11 proceeding until they ceased doing business. Additionally, according to the Disclosure Statement,

The Debtors have historically borrowed [sic] a large amount of interest bearing debt. Prior to filing the Chapter 11 petition, the Debtors owed Chase [Manhattan Bank] $9,000,000 in the aggregate and Arlington was owed approximately $3,000,000. The interest expense was a substantial drain on the Debtors' financial condition. The combination of a disproportionately large interest expense, combined with substantial expenditures for capital improvements to increase the efficiency of the Harriman mill and depressed market conditions for corrugating medium resulted in the Debtors not having sufficient funds to pay their debts as they came due, necessitating the filing of the Chapter 11 petitions.

In addition to the high level of outside borrowing, the Debtors are linked by a web of intercorporate loans, dating back to the organization of Lawrence and Packaging in 1971 and the organization of Harriman in 1975. The Debtors' consolidated financial Statements for the year ended September 30, 1984 reveal the following:

| | LAWRENCE PAPERBOARD CORPORATION | LAWRENCE PACKAGING CORPORATION | HARRIMAN PAPERBOARD CORPORATION | TOTAL |
|---|---|---|---|---|
| Intercompany Liabilities | $1,674,791 | $12,731,719 | $10,635,818 | $25,042,328 |
| Intercompany Receivables | $13,720,206 | $10,781,095 | $767,442 | $25,268,743 |

The affidavit of Philip McGlone, an Assistant Treasurer and a commercial finance auditor for Arlington, further reveals that Harriman owed Packaging $10,607,954 (up from $2.4 million in September 1980); Packaging owed Lawrence $12,449,958 (up from $2.9 million in September 1980); and Lawrence owed Harriman $2,433,901.

With respect to the intercorporate debt, Mary Caimi indicated that from time to time between 1981 and 1985 she would call officers at Chase Manhattan Bank ("Chase") (not Arlington) to determine how much money Chase was willing to advance to one or the other of the three Debtors. After Chase made a wire transfer of funds, she testified that she "would then transfer funds from that account to the accounts of the other two companies in order to meet their short-term cash needs." Mary Caimi explained ·Harriman's substantial debt to Packaging and Packaging's substantial debt to Lawrence as follows:

> If the funds were transferred initially to the account of Lawrence, I would generally transfer funds from that account to the accounts of Packaging and/or Harriman. If the funds were initially transferred to the account of Packaging, I would generally transfer funds from that account to the account of Harriman.

The Examiner also indicated that "the funds flowed from a profitable Lawrence Paperboard to Harriman."[1] Like, Mary Caimi, the Examiner, however, did not substantiate his observations with specifics, such as 1) the dates of the transfers; 2) the amounts of the transfers; and 3) the relationship between Chase disbursements and Arlington's guaranties. Accordingly, the Committee disputes the inference drawn by Arlington that the intercorporate debt was the result of the transfers described by Mary Caimi, suggesting instead that the high intercorporate debt was the result of the transfer of goods, cash or credits in ways unrelated to the disbursement of loan proceeds.

Arlington's relationship with Lawrence and Packaging commenced in 1971 and its relationship with Harriman commenced in 1975 when that company was organized. Robert J. DeLuca ("DeLuca"), Senior Vice-President of Arlington, testified by way of affidavit, that Arlington made various loans to the Debtors either individually or jointly between 1971 and 1984. In addition to loans, evidenced by promissory notes, DeLuca indicated that Arlington permitted the Debtors to overdraw their accounts and also participated in the loan agreements between the Debtors and Chase. DeLuca, however, did not specify the nature of Arlington's participation in the Debtors' loan agreements with Chase.

DeLuca also indicated that Arlington relied upon consolidated financial statements that it received from the Debtors from time to time, and that Arlington sought and obtained guaranties from the Debtors whenever it required additional security for loans made or funds advanced. Arlington received the following guaranties from the Debtors:

| Date | Guarantor | Principal Debtor | Amount | Classification[2] |
|---|---|---|---|---|
| 6/30/75 | Packaging | Harriman | $1,800,000 | Cross-stream |
| 6/30/75 | Lawrence | Harriman | $1,800,000 | Downstream |

---

**1.** He added "Lawrence Packaging, one must recall, existed largely to absorb Lawrence Paperboard's excesses and protect it from the need to sell these into the open market at much reduced prices; also to even out production. Hence, Packaging Loss [sic] was largely Lawrence Paperboard's."

**2.** "Guaranties by affiliated corporations may be classified according to three categories: 1. A *downstream* guaranty, where the parent guarantees its subsidiary's obligation; 2. a *cross-stream* guaranty, where one subsidiary guarantees another subsidiary's obligations; and 3. an *upstream* guaranty, where a subsidiary guarantees its parent's obligation." *Carl, Fraudulent Transfer Attacks on Guaranties in Bankruptcy,* 60 Am. Bankr.L.J. 109, 115 (1986).

| Date | Guarantor | Principal Debtor | Amount | Classification |
|------|-----------|------------------|--------|----------------|
| 3/24/82 | Harriman | Packaging | $2,000,000 | Cross-stream |
| 3/24/82 | Harriman | Lawrence | $2,000,000 | Upstream |
| 7/27/82 | Harriman | Packaging | $2,000,000 | Cross-stream |
| 7/27/82 | Harriman | Lawrence | $2,000,000 | Upstream |
| 8/19/82 | Lawrence | Packaging | $2,000,000 | Downstream |
| 8/19/82 | Packaging | Lawrence | $2,000,000 | Upstream |

DeLuca asserted that "[i]f the Debtors had not executed the guaranties ... Arlington would have ceased to loan funds to all the Debtors, and would have demanded payment of loans already outstanding."[3] Caimi added that "[w]hen Arlington ... asked that the companies provide guaranties of each other's obligations to Arlington, I executed such guaranties, because I believed that funds advanced to each company would not only benefit that company, but other companies as well."

An examination of the guaranties reveals, however, that, on their face, the only consideration recited is in the following language:

> For valuable consideration, the receipt of which is hereby acknowledged, and in consideration of the Arlington Trust Company (hereinafter called the "Bank") having made, or now or in the future making, advances or otherwise giving credit to [the "Borrower"], however such advances may be made or evidenced, and to induce the Bank to continue existing credits and loans extended to the Borrower, and from time to time hereafter to make further loans, advances, extensions of credit or other financial accomodations to the Borrower and otherwise to assist the Borrower in financing its business or sales by obtaining credit under revolving loan security agreements with discretionary advances by the Bank, the undersigned does hereby unconditionally guarantee. . . .

**3.** The Committee objects to the DeLuca affidavit to the extent that he does not have first hand knowledge of the Debtors' accounts prior to November 1983.

## DISCUSSION

The United States Supreme Court, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), recently considered the issue of whether a defendant satisfied its initial burden of production in moving for summary judgment on the ground that the plaintiff lacked evidence to establish an essential element of her case at trial. In reversing the Court of Appeals for the District of Columbia Circuit, the Supreme Court succinctly stated the summary judgment rule as follows:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.*

*Id.* at 2552–53 (emphasis supplied).

Noting that "[o]ne of the principal purposes of the summary judgment rule is to

isolate and dispose of factually unsupported claims or defenses," *id.* at 2553, the Supreme Court reiterated its statement in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), that " 'both the commentary on and the background of the 1963 Amendment [to Fed.R. Civ.Pro. 56(e)] conclusively show that it was not intended to modify the burden of the moving party ... to show initially the absence of a genuine issue concerning any material fact.' " *Celotex Corp. v. Catrett*, 106 S.Ct. at 2554, quoting *Adickes,* 398 U.S. at 159, 90 S.Ct. at 1609. However, the Court then indicated that

> [W]e do not think the *Adickes* language quoted above should be construed to mean that the burden is on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof.... the burden on the moving party may be discharged by "showing"—that is, pointing out to the District Court—that there is an absence of evidence to support the nonmoving party's case.

*Id.* at 2554.

In a dissenting opinion, Justice Brennan, joined by Justice Blackmun and Chief Justice Rehnquist, criticized the majority for failing to clearly explain what is required of a moving party seeking summary judgment on the ground that the nonmoving party cannot prove its case. Justice Brennan, in a discussion of the summary judgment rule that he believed to be consistent with the court's opinion, observed that the burden of establishing the nonexistence of a "genuine issue" has two components: "an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." *Id.* at 2556. With respect to the burden of production, Justice Brennan indicated that, if the burden of persuasion at trial is on the nonmoving party, the burden of production may be satisfied by the submission of affirmative evidence that either 1) negates an essential element of the nonmoving party's claim; or 2) demonstrates that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Id.* at 2557. Noting that the mechanics of discharging the burden of production are "trickier" when the moving party choses the second option, Justice Brennan reiterated that the moving party must clearly show that there is no evidence in the record to support a judgment for the nonmoving party.

In its brief in opposition to Arlington's Motion for Summary Judgment, the Committee concedes that there is no genuine issue of fact with respect to whether the guaranties were properly authorized or were subsequently ratified. Accordingly, Arlington is entitled to judgment on Count One of its Amended Complaint.

Additionally, the Committee concedes that Lawrence's guaranties of the debts of Harriman and Packaging, the so-called downstream guaranties, were supported by fair consideration, since Lawrence received the benefit of any loans by Arlington as a result of its stock ownership. *See* Carl, *supra* note 2, at 115 ("Downstream guaranties do not pose special transfer problems since the guarantor owns the stock of the principal debtor."). Thus, the Court only must consider whether the so-called upstream and cross-stream guaranties, on the facts now before it, were supported by fair consideration.

Under section four of the Uniform Fraudulent Conveyance Act (the "UFCA"), "[e]very conveyance made and every obligation incurred by a person who is or who will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." Mass.Gen.Laws Ann. ch. 109A, § 4 (West 1958 & Supp.1987). Fair consideration is defined at section three of the Act as follows:

> Fair consideration is given for property or obligation—
>
> (a) When in exchange for such property or obligation, as a fair equivalent therefor, and in good faith, property is

conveyed or an antecedent debt is satisfied, or

(b) When such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained.

Mass.Gen.Laws Ann. ch. 109A, § 3 (West 1958 & Supp.1987).[4]

One commentator has pointed out that fair consideration for a subsidiary's guaranty of its parent's obligation is governed by subsection (a) of section 3 of the UFCA, while fair consideration for the grant of security interests is governed by subsection (b). *See* Coquillette, "Guaranty of and Security for the Debt of a Parent Corporation by a Subsidiary Corporation," 123 Case W.Res.L.Rev. 433, 451 (1980). It appears from an examination of the guaranties attached to the DeLuca affidavit and a review of the Amended Complaint that only the June 30, 1985 guaranties and the August 19, 1982 guaranties executed by Lawrence and Packaging involved security interests. However the parties did not address this point in their memoranda, and it is not dispositive of the instant dispute.

There is no question that the UFCA covers the giving of guaranties, as well as the granting of security interests, because the giving of a guaranty is an "obligation incurred," *Rubin v. Manufacturers Hanover Trust*, 661 F.2d 979, 990–91 (2nd Cir.1981), and the granting of a security interest in property is a transfer, 11 U.S.C. § 101 (48). *See generally* Carl, *supra* at 118. More-

over, since the UFCA does not specify to whom the property must be conveyed, the existence of fair consideration is safely determined by what the subsidiary (or sister corporation in the case of cross-stream guaranties) has obtained in the transaction. *See* Coquillette, *supra* at 452.

In its brief in support of its motion, Arlington concedes, for purposes of its motion only, that the Debtors were insolvent at the time the guaranties were given and at all later points in time, thereby obviating consideration of the insolvency aspect of section 4 of the Act.[5] With respect to Count Two, Arlington asserts that the Committee's answer to interrogatory number six dealt only with the existence of any consideration, not want or failure of consideration. In its brief, the Committee does not directly address its contentions in Count Two that the guaranties are void for want or failure of consideration. Rather, the Committee has chosen to subsume the questions raised by Count Two in the issue of fair consideration. Both parties in their briefs indicate that the only issue in dispute is whether the Debtors' intercorporate upstream and cross-stream guaranties were executed in exchange for fair consideration.[6] However, the issue may be framed more specifically than that. It is whether Arlington or the Committee has the burden of quantifying the consideration received by Harriman and Packaging, in exchange for their reciprocal guaranties of each other's debts to Arlington, as well as their respective guaranties of Lawrence's obligations to Arlington, so that the Court can

4. Section 67(d)(1)(e) of the Bankruptcy Act contains a substantially identical definition. For an analysis of both the Bankruptcy Act and the UFCA with respect to intercorporate guaranties, *see* Rosenberg, "Intercorporate Guaranties and the Law of Fraudulent Conveyances: Lender Beware," U.PA.L.Rev. 235 (1976). The language of section 548 of the Bankruptcy Code, "reasonably equivalent value," is broad enough to include the language of the Bankruptcy Act, "fair consideration," although the statutes are different in other respects. *See* 4 L. King *Collier on Bankruptcy* ¶ 548.01[2] (15th ed. 1987).

5. A finding of good faith is required by section 3 of the UFCA. The Creditors' Committee in Count Five, on information and belief, has al-

leged that the payment, transfers and obligations incurred by the Debtors pursuant to the guaranties were made with actual intent to hinder or defraud creditors but has not addressed the good faith issue in response to Arlington's motion. The Court will presume that, like insolvency, it is not an issue that warrants consideration for purposes of this motion.

6. Arlington states that "the only issue in dispute ... is whether each guarantor received 'fair consideration' in exchange for its guaranty." The Committee states that "[t]he sole issue in dispute ... is whether certain intercorporate quaranties executed by the debtors were for 'fair consideration' within the meaning of the Massachusetts fraudulent conveyance statute...."

compare the value of what Harriman and Packaging received with the value of their guaranties.

Like the question on insolvency, fairness of consideration is a question of fact. *In re Roco Corp.*, 701 F.2d 978, 981–82 (1st Cir.1983); *Klein v. Tabtchnick*, 610 F.2d 1043, 1047–48 (2nd Cir.1979). *But see American Fidelity Co. v. Harney*, 351 Mass. 163, 217 N.E.2d 905 (1966) (The issue of the fairness of consideration within the fraudulent conveyance statute is a mixed question of law and fact.) To determine whether the value of what Harriman and Packaging actually received was the fair equivalent of or was disproportionately small compared to the value of their guaranties, "the court must attempt to measure the economic benefit, if any, that accrued to each bankrupt as a result of the third person's indebtedness...." *Rubin*, 661 F.2d at 993.

Arlington maintains that the undisputed facts demonstrate that Harriman and Packaging received fair consideration for the upstream and cross-stream guaranties. Arlington cites the following as establishing fair consideration: 1) direct benefits, in the form of funds disbursed by the principal obligors to the guarantors, as well as reciprocal guaranties given by the principal obligors; 2) in the case of Packaging, indirect economic benefits attributable to the business relationship between Packaging and Lawrence; and 3) the strong identity of interest among the Debtors.

Arlington, relying on the affidavit of Mary Caimi, notes that the Debtors' practice of distributing funds virtually compels a finding that Packaging's guaranty of Lawrence's obligations was supported by fair consideration because a significant part of funds loaned to Lawrence were distributed to Packaging. Likewise, Arlington asserts that Harriman's guaranties of Lawrence's and Packaging's obligations also were supported by fair consideration because of the way funds were distributed, pointing to the high level of intercorporate debt to establish that funds were distributed as a result of Harriman's and Packaging's guaranties. Arlington finds additional direct benefits in the reciprocal nature of the guaranties of Lawrence and Packaging executed on August 19, 1980, as well as all the other guaranties.

With respect to Packaging's guaranty of Lawrence's obligations, Arlington relies on the affidavit of Caimi to establish indirect business benefits as fair consideration for Packaging's, guaranty. These benefits obstensibly flowed from the supply by Lawrence of virtually all of the raw materials used by Packaging.

Finally, Arlington relies on the strong identity of interests among the Debtors to satisfy the fair consideration requirement of Mass.Gen.Laws Ann. ch. 109A. In support of this position, Arlington cites the ownership and control of the Debtors by Caimi and advances the same arguments used by the Committee in support of the substantive consolidation of the Debtors. The Debtors' and the Committee's First Amended Consolidated Plan of Reorganization was predicated on the substantive consolidation of the Debtors. In the Disclosure Statement to the Plan, the Committee and the Debtors state the following:

> All of the outstanding stock of Lawrence is owned by Joseph Caimi. Each of Harriman and LPG is a wholly owned subsidiary of Lawrence. The officers and directors of Lawrence were at all time prior to the filing identical to the officers and directors of its subsidiaries. All of the lending facilities of the Debtors were obtained on a consolidated basis with each of the Debtors cross-guaranteeing the debts of the other Debtors. The funds which were advanced by Chase, both before and after the filing of the petition, were made available to the Debtors on a consolidated basis. Although most of the loans were made directly to Lawrence, the funds were in fact distributed by Lawrence to whichever of the Debtors needed the proceeds of the Chase loans at any particular time. In addition, the Debtors' financial statements show total intercompany indebtedness of approximately $25,000,000. This large level of intercompany indebtedness which exceeds the aggregate amount of

all other indebtedness of these Debtors to third party creditors illustrates the extent to which the business and operations of these three Debtors were intermingled.

The Committee, in its response to Arlington's motion argues that Arlington merely identified types of benefits that might constitute or contribute to fair consideration and failed to establish how much these benefits, if they existed at all, were worth. The Committee criticizes each source of fair consideration identified by Arlington.

As an initial matter, the Committee notes that the only consideration recited on the face of the guaranties is consideration passing to Arlington, not the guarantors. The Committee argues that the Court must begin its review with the premise that the guaranty of a third party's debts is *prima facie* not made for consideration.

According to the Court of Appeals for the Second Circuit,

> if the debt secured by the transaction is not the debtor's own, then his giving of security will deplete his estate without bringing in a corresponding value from which his creditors can benefit, and his creditors will suffer just as they would if the debtor had simply made a gift of his property or obligation. Accordingly, courts have long recognized that '[t]ransfers made to benefit third parties are clearly not made for a 'fair consideration,' and, similarly, that 'a conveyance' by a corporation for the benefit of an affiliate [should not] be regarded as given for fair consideration as to the creditors of the conveying corporation.

*Rubin,* 661 F.2d at 991 (citations omitted). Although the *Rubin* case stands for the proposition that transfers solely for the benefit of third parties do not furnish fair consideration, the *Rubin* court and others have recognized that indirect benefits may furnish fair consideration. The court in *Rubin* stated its view of indirect benefits as follows:

> If the consideration given by the third party has ultimately landed in the debtor's hands, or if the giving of the consid-

eration to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved ... provided, of course, that the value of the benefit received by the debtor approximates the value of the property or obligation he has given up. In ... these situations, the net effect of the transaction on the debtor's estate is demonstrably insignificant, for he has received, albeit indirectly, either an asset or the discharge of a debt worth approximately as much as the property he has given up or the obligation he has incurred.

*Id.* at 991–92.

Other courts have referred to an "identity of interest" as an exception to the rule that an insolvent debtor receives less than a reasonable equivalent value when it transfers its property in exchange for consideration which passes to a third party. For example, in *In re Royal Crown Bottlers of North Alabama, Inc.,* 23 B.R. 28 (Bankr.N.D.Ala.1982), the court observed: "A clear distinction from this rule exists, however, if the debtor and the third party are so related or situated that they share an 'identity of interests,' because what benefits one, will in such case, benefit the other to some degree." *Id.* at 30. The Alabama court, however, indicated that "[t]he ultimate question then becomes one of determining the value of this vicarious benefit and testing it by the measure of 'reasonably equivalent' for the property transferred to the debtor." *Id.*

■ The Court is convinced, based upon the preceding authorities, that the mere failure of the guaranties themselves to recite fair consideration passing to the guarantor of an affiliate's debt is not inevitably fatal to a finding of fair consideration. Additionally, the Court is convinced that indirect benefits in the form of funds flowing from the parent to the guarantor subsidiary, or intangible benefits in the form of maintenance of the parent's financial strength, may constitute fair consideration.[7] Nevertheless, the Court is im-

---

7. The Court notes that a guarantor's equitable

rights such as contingent subrogation and con-

pressed by Committee's responses to the alleged benefits proposed by Arlington as providing fair consideration.

The Committee challenges the inference Arlington draws from the affidavit of Mary Caimi. Despite Arlington's assertions that the amount of intercorporate debt and the pattern of disbursing funds from Lawrence through Packaging to Harriman establishes, indeed compels, a finding of direct economic benefits, the Committee maintains that Arlington did not establish 1) that the amount of intercorporate debt was the result of the transfers, particularly since the funds involved were borrowed from Chase: and 2) that the guarantors bargained for, or were promised, access to the funds disbursed. According to the Committee, the coincidence that benefits flow both ways does not mean that there is a contract or consideration. *See, e.g., In re Stolrow's Inc.,* 813 F.2d 997, 998–99 (9th Cir.1987); *In re Kennebago Corp.,* 50 B.R. 153, 156 (Bankr.D.Me.1985). With respect to Caimi's affidavit, the Committee notes that it fails to even mention intercorporate sharing of loan proceeds and that even if the expectation of a benefit could be construed as a binding promise, an executory contract does not constitute fair consideration. *See generally* McLauglin, "Application of the Uniform Fraudulent Conveyance Act," 46 Harv.L.R. 404, 414 (1933). As has been mentioned, the Committee maintains that the high intercorporate debt can be explained just as easily as the result of the transfer of cash, goods or credits in ways unrelated to the loan proceeds.

Although the Committee recognizes that there may have been some indirect benefit to Packaging from Packaging's upstream guarantee of Lawrence's obligations, it points out that Arlington made no effort to show how much benefit Packaging derived. Indeed, the Committee suggest that, unlike the situation in cases such as *Telefest Inc. v. VU–TV, Inc.,* 591 F.Supp. 1368 (D.N.J.

1984) and *In re Jones,* 37 B.R. 969 (Bankr. N.D.Tx.1984), the evidence on the record suggests Packaging derived no benefits and was merely a "captive" of Lawrence.

Finally, with respect to Arlington's identity of interest argument, the Committee admits that such an identity of interest existed but argues that it merely provided the opportunity for abuse. In the Committee's words, the identity of interest among the Debtors "supplies cold comfort to creditors whose claims are defeated by transfers that result in the depletion of the estate." The Court notes, as well, that the *In re Crown Bottlers of North Alabama, Inc.,* 23 B.R. 28 (Bankr.N.D.Ala.1982), case strongly suggests that the value of the vicarious benefit must be quantified for the Court to find fair consideration.

■ Neither Arlington nor the Committee attempted to quantify the consideration passing to Harriman and Packaging in exchange for their upstream and cross-stream guaranties. Clearly, such a quantification is necessary because without it the Court cannot compare the consideration given by Arlington and ostensibly passed through Lawrence to Packaging and Harriman with the value of the guaranties given by Packaging and Harriman.

The *Rubin* court and all other courts considering the issue of fair consideration under the Uniform Fraudulent Conveyance Act, section 67(d) of the Bankruptcy Act or section 548 of the Bankruptcy Code squarely place the burden of showing that a conveyance was made without fair consideration on the plaintiff, in this case the Committee. The Committee acknowledges this. Thus, as Justice Brennan recognized, the burden of production issue with respect to a motion for summary judgment is trickier where, as here, the defendant Arlington is the moving party. Has Arlington submitted affirmative evidence negating an essential element of the Committee's claim?

---

tribution rights may have value and may be considered in deciding whether the guarantor received fair consideration. *Compare In re Alexander Dispos-Haul Systems, Inc.,* 36 B.R. 612 (Bankr.D.Or.1983); *Matter of Emerald Hills Country Club, Inc.,* 32 B.R. 408 (Bankr.S.D.Fla.

1983) *with Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979 (2nd Cir.1981). Obviously, these rights are valueless in the instant case and have not even been mentioned by the parties.

Has Arlington demonstrated that the Committee's evidence is insufficient to establish an essential element of its claim? Has Arlington satisfied its ultimate burden of persuasion? The answers to these questions are close ones. The Committee, in response to Arlington's motion, did not point to any additional evidence to counter the evidence put forth by Arlington. However, the Committee by challenging the inferences drawn by Arlington did demonstrate that a genuine issue exists as to the existence of fair consideration. At this point, the burden of production arguably reverted to Arlington, or, it arguably required the Committee to go one step further and quantify the consideration—to point to evidence in the record that was ignored or overlooked by Arlington that would support its claims.

The Court finds that in the last analysis that Arlington has failed to meet its ultimate burden of persuasion, although it has gone a long way toward showing that there is an absence of evidence to support the Committee's case and that the Committee may be unable to prove an essential element of its claim. However, considering the facts presented there remain substantial questions as to the amount and fairness of the consideration. The Court is required to resolve doubts in favor of the nonmoving party, *Ismert and Associates v. New England Mutual Life Insurance Co.,* 801 F.2d 536, 537 (1st Cir.1986). It is particularly appropriate to do so in this instance where the rule enunciated by the Supreme Court is difficult to apply. Although the Court appreciates Arlington's position and the considerable time and effort put into its motion and supporting documents, fairness requires that the parties be able to put on their respective cases.

In spite of this ruling, the Court has reservations about the Committee's ability to prove its case. At trial, there will be no question that the Committee will have the burden of quantifying the consideration. *See Rubin,* 661 F.2d at 994. Assuming the Committee proceeds at trial as it has in response to Arlington's motion and Arlington advances the same position in response as it has herein, then this Court will be in substantially the same position as the district court in *Rubin* prior to its judgment being vacated and the matter being remanded by the Court of Appeals for further fact finding. According to the Second Circuit, in such a situation, additional facts are necessary to enable the trial court to "measure the economic benefit, if any that accrued to each bankrupt as a result of the third person's indebtedness, and [to] determine whether that benefit was 'disproportionately small' when compared to the size of the security that the bankrupt gave and the obligations that it incurred." *Id.* at 993. Clearly, it will be up to the Committee to supply the additional facts that will enable the Court to measure the economic benefit accruing to Harriman and Packaging.

In view of the foregoing and the memorandum and arguments of counsel, the Court hereby enters summary judgment in favor of Arlington on Count One and denies Arlington's motion with respect to Counts Two and Five.